### SCHOOL DIST. NO. 23 of OKFUSKEE COUNTY v. COMMISSIONERS OF THE LAND OFFICE et al.

No. 23163. Nov. 21, 1933.

Sid White and Hayes, Richardson, Shartel, Gilliland & Jordan, for plaintiff in error.

J. Berry King, Atty. Gen., Randell S. Cobb, Asst. Atty. Gen., and Malcolm E. Rosser, Special Counsel, for defendants in error.

SWINDALL, J. An action was commenced in the district court of Oklahoma county by the plaintiffs in error against the Commissioners of the Land Office of Oklahoma and the individual officers composing said board as set forth in the statement of this opinion, for a writ of mandamus to compel said defendants in error to pay to the plaintiffs in error and other common school districts in the state of Oklahoma certain moneys collected for the leasing of school and other public lands for oil and gas mining purposes. The parties herein appear in the same order as they appeared in the trial court and will hereafter be referred to as plaintiff and defendant. An alternative writ of mandamus was granted upon the petition of plaintiff, and the defendant filed its response thereto. Upon issue joined between the plaintiff and defendant on the petition and return to the alternative writ, a trial of the issue was had in the district court, and upon consideration of the facts the alternative writ was vacated and prayer of plaintiff's petition denied. The plaintiff has appealed to this court from the judgment of the trial court denying it relief.

In brief, the question for us to determine is the disposition to be made of the funds derived from an oil and gas lease on school land granted the state of Oklahoma in the Enabling Act under which the state of Oklahoma was erected.

It is the contention of the plaintiff that the delay rentals, royalty, and bonus money paid by the successful bidder for an oil and gas lease on school lands is rental and income from such lease and should go into the common school fund of the state. It is the contention of the defendant that all proceeds from mineral leases, including oil and gas leases, should be paid into the permanent school fund, and the interest derived from the investment of said fund only should be used in supporting the common schools of the state of Oklahoma. A proper determination of the issues involved requires a construction and consideration of certain terms and provisions of the Enabling Act and certain sections of the Constitution of the state of Oklahoma.

Section 7 of the Enabling Act provides, in part:

"That upon the admission of the state into the Union sections numbered sixteen and thirty-six, in every township in Oklahoma Territory, and all indemnity lands heretofore selected in lieu thereof, are hereby granted to the state for the use and benefit of the common schools. * * *

"There is hereby appropriated, out of any money in the treasury not otherwise appropriated, the sum of five million dollars for the use and benefit of the common schools of said state in lieu of sections sixteen and thirty-six, and other lands of the Indian Territory. Said appropriation shall be paid by the Treasurer of the United States at such time and to such person or persons as may be authorized by said state to receive the same under the laws to be enacted by said state, and until said state shall enact such laws said appropriation shall not be paid, but said state shall be allowed interest thereon at the rate of three per centum per annum, which shall be paid to said state for the use and benefit of its public schools. Said appropriation of five million dollars shall be held and invested by said state, in trust, for the use and benefit of said schools, and the interest thereon shall be used exclusively in the support and maintenance of said schools. * * *"

Under the Enabling Act, section 13, in the Cherokee Outlet, the Tonkawa Indian Reservation, and Pawnee Indian Reservation, re-

served by the President of the United States by proclamation issued August 19, 1893 (28 U. S. Stat. p. 1222), opening to settlement the said lands, and by any act or acts of Congress since said date, and section 13 in all other lands which have been or may be opened to settlement in the Territory of Oklahoma, and all lands theretofore selected in lieu thereof, is reserved and granted to the state for the use and benefit of the University of Oklahoma and the University Preparatory School, one-third; of the normal schools then established or thereafter to be established, one-third; and to the Agricultural and Mechanical College and the colored Agricultural Normal University, one-third; the said lands or the proceeds thereof as above apportioned to be divided between the institutions as the Legislature of the state may prescribe, provided that the said lands so reserved or the proceeds of the sale thereof shall be safely kept or invested and held by said state and the income thereof, interest, rentals, or otherwise, only, shall be used exclusively for the benefit of said educational institutions. The section further provides that such educational institutions shall remain under the exclusive control of the state, and that no part of the proceeds arising from the sale or disposition of any lands therein granted for educational purposes or the income or rentals thereof shall be used for the support of any religious or sectarian school, college, or university. The section also provides that section 33 and all lands theretofore selected in lieu of section 33 theretofore reserved under said proclamation and acts of Congress for charitable and penal institutions and public buildings, shall be apportioned and disposed of as the Legislature of the state of Oklahoma may prescribe. The first part of section 8, relative to leasing, deals with agricultural leases and provides that the income thereof, interest, rentals, or otherwise, only, shall be used exclusively for the benefit of said educational institutions named in said section. The words "or otherwise" were evidently inserted to cover some profit or income that might accrue to the fund not covered by the words "interest" or "rentals", such as damages recovered from a lessee for failure to pay rentals or a tenant holding over after the expiration of his lease. Section 9 provides that if said sections 16 and 36, and lands taken in lieu thereof, granted to the state for the support of common schools, are sold, such lands must be appraised and sold at public sale, and that the proceeds are to constitute a permanent school fund, the interest of which only shall be expended in support of such schools, and further provides that said lands may be leased for a period not to exceed ten years under such regulations as the Legislature may prescribe, and section 10 of the Enabling Act provides that sections 13 and 33 may be appraised and sold at public sale, and also provides that said lands may be leased for periods of not more than five years under such rules and regulations as the Legislature may prescribe, and until such time as the Legislature may prescribe such rules, these and all other lands granted to the state shall be leased under existing rules and regulations. Then we find in section 8 of the Enabling Act a general provision relating to mineral lands. It reads as follows:

"Where any part of the lands granted by this act to the state of Oklahoma are valuable for minerals, gas, and oil, such lands shall not be sold by the said state prior to January first, nineteen hundred and fifteen; but the same may be leased for periods not exceeding five years by the state officers duly authorized for that purpose, such leasing to be made by public competition after not less than 30 days' advertisement in the manner to be prescribed by law, and all such leasing shall be done under sealed bids and awarded to the highest responsible bidder. The leasing shall require and the advertisement shall specify in each case a fixed royalty to be paid by the successful bidder, in addition to any bonus offered for the lease, and all proceeds from leases shall be covered into the fund to which they shall properly belong, and no transfer or assignment of any lease shall be valid or confer any right in the assignee without the consent of the proper state authorities in writing; Provided, however, that agricultural lessees in possession of such lands shall be reimbursed by the mining lessees for all damage done to said agricultural lessees' interest therein by reason of such mining operations. The Legislature of the state may prescribe additional legislation governing such leases not in conflict herewith."

This paragraph in section 8 fills the office of a separate section in the Enabling Act and relates to all lands granted by said act to the state of Oklahoma that are valuable for minerals. So, considering sections 8, 9, and 10 together, we find provisions in each section relating to the land therein granted for leasing the same for agricultural purposes, such as farming and stock raising, and provisions that the income, interest, rentals, and otherwise, from such agricultural

leases shall be used exclusively for the educational institutions mentioned in section 8 and the support of the common schools mentioned in section 9, and then we find the paragraph in section 8 relating to the leasing of all lands granted the state that are valuable for mineral purposes. In this paragraph it provides that all proceeds from leases shall be covered into the fund to which they properly belong, that is, all proceeds from mineral leases, including oil and gas leases, shall be recovered into the proper fund designated by Congress in the Enabling Act. Clearly, Congress had in mind and intended that the royalty, rental, and bonus money offered for oil and gas leases, where the land was common school land, should be paid into the permanent school fund, the interest only of which should be expended in support of such schools as provided for in section 9; and that where college land, section 13, was leased for oil and gas, all the proceeds from such lease should be paid into the funds designated in section 8, one-third to the University of Oklahoma and the Preparatory School, one-third to the normal schools, now established or hereafter to be established, and one-third to the Agricultural & Mechanical College and the Colored Agricultural Normal University. Here the Congress is dealing with a lease which may constitute a conversion pro tanto where oil and gas is produced or an impairment or diminution of the fee by the lessee entering upon said leased premises and digging slush pits and drilling wells which damage the land in an effort to develop the oil and gas lease and produce oil. It evidently had in mind the fact that under a mineral lease there would be some depreciation of the corpus. If the lessee paid a bonus for an oil and gas lease and agreed in the lease to pay fixed rental for delay in commencing operations of drilling a well, such payments are incident to producing oil and gas, the delay rental just as much as the bonus money. The proper leasing authorities may have a valid agricultural lease on the land which expires about the date the oil and gas lease is executed, and while the act provides that the lessee under the oil and gas lease shall pay to the holder of the agricultural lease such damages as he may sustain, it is a matter of common knowledge that no person would pay as much for an agricultural lease under such circumstances as they would if the oil and gas lease had not been executed. Or, during the life of the oil and gas lease a well may be drilled upon the leased premises, slush pits dug and a large amount of slush run therein, salt water may be encountered, some of the wells may be producers and others may be dry holes, and a number of other things may happen, which it is common knowledge do happen, to reduce the value of the surface of the land and practically destroy a portion of the same for agricultural purposes and thereby reduce its value. If oil and gas are found in paying quantities, and the lease is developed, the value of the land is materially reduced except for the rentals, bonus money, and royalties paid into the permanent school fund; if oil and gas are not found in paying quantities, the land is permanently and materially damaged for other purposes. So, it appears to us that it is fair to assume that in enacting this portion of said section 8, Congress intended that under this class of leases all the proceeds from the oil and gas lease should be placed in the permanent university and college fund where university or college land was leased, and in the permanent common school fund where common school land was leased, in order that the value of lands may not be materially impaired or diminished, and when a portion of it is permanently and materially diminished by drilling wells, digging slush pits, filling the slush pits with all kinds of soil and rock cuttings, encountering salt water or other water highly impregnated with minerals, and permitting some to escape from tanks and flow over the land and damage or destroy the same for farming or grazing purposes, the bonus money and delay rentals would to some extent reimburse the permanent fund for such damage.

In the case of Hubert Work, Secretary of the Interior, v. U. S. ex rel. William T. Mosier, 261 U. S. 352, 67 L. Ed. 693, the Supreme Court of the United States had under consideration the Act of 1906 (Act June 28, 1906, 34 Stat. 539), entitled: "An Act for the division of the lands and funds of the Osage Indians in Oklahoma Territory, and for other purposes." This act provided for the enrollment of the tribe, including minors, and for the division of the lands between them by selection, the selection for the minors being made by their parents. but forbade the sale of the oil, gas, coal, or other minerals covered by the lands, the minerals being reserved to the use of the tribe for a period of 25 years, the royalties to be paid to the tribe. The act directed that the gas, oil, coal. and other minerals should become the property of the individual owners of the land at the end of

that period unless otherwise provided. Section 3 of the act directs the leasing of oil, gas, and other minerals in these lands by the tribal council under such rules and regulations as the Secretary may direct and with his approval, provided: "That the royalties to be paid to the Osage Tribe under any mineral lease so made shall be determined by the President of the United States." In discussing an oil and gas lease on Osage Indian land, the court said:

"The bonus, which was the result of bidding for desirable and profitable oil and gas leases, secured for the members of the Osage Tribe the just value of the use of their property which the fixing of royalties in advance by the President was not adapted to give them. It was, in effect, a supplement to the royalties already determined. It was really part of the royalty or rental in a lump sum or down payment. We do not see how it can be classified as anything else. It was income from the use of the mineral resources of the land. Of course, it involved a consumption and reduction of the mineral value of the land, but so does a royalty. This is an inevitable characteristic of income from the product of the mine. What was intended to be distributed to the members of the tribe was the income from the mineral deposits in their lands, and the bonus was part of that. Doubtless Congress had in mind regular annual or quarterly equal payments when it used the word 'royalties', and did not anticipate such large down payments. But, in the unexpected event, we must decide under what head the bonus is to be treated,—whether as capital or income, —and it seems clear to us that, in view of the entire statute, it is more aptly described by the latter term."

In the Osage Case (Work v. U. S.), the bonus, delay rental, and royalties were prorated among the members of the tribe. Under the school land grant in the Enabling Act the land or the proceeds from the sale thereof are to be paid into a permanent school fund, and the interest only is to be used in maintaining the educational institutions mentioned in section 8 and the common schools mentioned in section 9. It was held by the Supreme Court of the United States in the Osage Case that the bonus, delay rental, and royalties were income from the use of the mineral resources of the land. In the case of Parker v. Riley, 250 U. S. 66, 63 L. Ed. 847, the rights of a child born to an enrolled full-blood Creek allottee after March 4, 1906, in and to the royalties derived from an oil and gas lease, were considered. In that case the court said:

"These minerals were part of the home-stead, and the lease was to operate as a sale of them as and when they were extracted. In that sense the heirs were exchanging a part of the homestead for the money paid as royalties, but no heir was surrendering any right to the others. Thus the rights of all in the royalties were the same as in the homestead. Nothing in the Act of May 27, 1908, makes to the contrary. Under the provision in section 9 specially providing for issue born after March 4, 1906, Julia was entitled for her support to the exclusive use of the entire homestead while she lived, but not beyond April 26, 1931, and those who took the fee took it subject to that right. The rights of all in the royalties must, as we think, be measured by that standard. In this view Julia is entitled to the use of the royalties, that is to say, the interest or income which may be obtained by properly investing them, during the same period, leaving the principal, like the homestead, to go to the heirs in general on the termination of her special right."

In the case of Wright v. Carter Oil Co., 97 Okla. 46, 223 P. 835, the Carter Oil Company brought an action in the district court of Stephens county in the nature of a "stakeholder's suit" to determine the parties to whom rentals due under its oil and gas lease should be paid, and this court in determining that issue, in the third paragraph of the syllabus, held that:

"Bonus, rentals, and royalty are income from the use of the mineral resources of the land."

See, also, Richards v. Lowery, 135 Okla. 246, 275 P. 335. In the case of State ex rel. School District No. 1, In Weston County, v. Snyder, State Treasurer (Wyo.) 212 P. 758, the Supreme Court of Wyoming had under consideration an act of Congress similar to the Enabling Act of the state of Oklahoma granting school lands to that state, and after a very exhaustive and clear discussion of the facts relative to an oil and gas mineral lease on school land, held, that rents and royalties derived from oil leases are not the ordinary rentals contemplated by article 7, sec. 7, of the Constitution of that state, but arise from and represent the corpus of the land and must be treated as principal becoming part of the permanent school fund. The rule announced in that case was followed by the Commission of Appeals of Texas in State ex rel. Attorney General v. Hatcher, State Treasurer (Tex.) 281 S. W. 192.

Section 1 of article 11 of the Constitution of our state accepts all grants of land and donations of money made by the United

States under the provisions of the Enabling Act and any other acts of Congress for the uses and purposes and upon the conditions and under the limitations for which the same were granted or donated, and the faith of the state is pledged to reserve said lands and moneys and all moneys derived from the sale of any of said lands as a sacred trust fund, and to keep the same for the uses and purposes for which they are granted or donated.

Section 2 of article 11 provides that:

"All proceeds of the sale of public lands that have heretofore been or may be hereafter given by the United States for the use and benefit of the common schools of this state, all such per centum as may be granted by the United States on the sales of public lands, the sum of five million dollars appropriated to the state for the use and benefit of the common schools in lieu of sections sixteen and thirty-six, and other lands of the Indian Territory, the proceeds of all property that shall fall to the state by escheat, the proceeds of all gifts or donations to the state for common schools not otherwise appropriated by the terms of the gifts, and such other appropriations, gifts, or donations as shall be made by the Legislature for the benefit of the common schools, shall constitute the permanent school fund, the income from which shall be used for the maintenance of the common schools in the state. The principal shall be deemed a trust fund held by the state, and shall forever remain inviolate. It may be increased, but shall never be diminished. The state shall reimburse said permanent school fund for all losses thereof which may in any manner occur, and no portion of said fund shall be diverted for any other use or purpose."

Section 3 of article 11 provides:

"The interest and income of the permanent school fund, the net income from the leasing of public lands which have been or may be granted by the United States to the state for the use and benefit of the common schools, together with any revenues derived from taxes authorized to be levied for such purposes, and any other sums which may be added thereto by law, shall be used and applied each year for the benefit of the common schools of the state, and shall be, for this purpose, apportioned among and between all the several common school districts of the state in proportion to the school population of the several districts, and no part of the fund shall ever be diverted from this purpose, or used for any other purpose than the support and maintenance of common schools for the equal benefit of all the people of the state."

Section 7, chapter 253, Session Laws 1917

(C. O. S. 1921, sec. 9430; O. S. 1931, sec. 5602), provides that:

"All funds arising from bonuses, royalties or rentals for oil and gas leases, shall be carried into and credited to the permanent funds for the use and purpose designated in the grant of such lands by Congress to the state of Oklahoma and all such funds shall be kept, handled and used in like manner as other moneys belonging to said permanent funds."

It is contended by the plaintiff that section 9430, supra, is unconstitutional in that it provides for all funds arising from bonuses, royalties, and rentals from oil and gas leases being carried into and credited to the permanent funds for the uses and purposes designated in the grant of such lands by Congress to the state of Oklahoma. From what we have heretofore said, we are of the opinion and hold that such contention is not well taken.

We think it clear that it was the intention of Congress in passing the Enabling Act and the framers of the Constitution of the state of Oklahoma, and the people in adopting the same, that all funds arising from bonuses, royalties, and rentals for oil and gas leases contemplated a diminution of the corpus of the school lands and that the same shall be carried into and credited to the permanent funds for the uses and purposes designated in the grant of such lands by Congress to the state of Oklahoma, and the judgment of the trial court in denying the writ of mandamus should be, and the same is hereby, affirmed.

RILEY, C. J., CULLISON, V. C. J., and McNEILL, OSBORN, BAYLESS, BUSBY, and WELCH, JJ., concur. ANDREWS, J., absent.