# DUCHESNE COUNTY et al. v. STATE TAX COMMISSION et al.

No. 6562. Decided July 20, 1943. (140 P. 2d 335.)

See 14 C. J. S., Charities, sec. 20; 10 Am. Jur., 651.

*Grant A. Brown,* of Salt Lake City, and *Grover A. Gile,* Atty. Gen., for appellants.

*George E. Stewart,* of Roosevelt, and *L. A. Hollenbeck,* of Duchesne, for respondents.

LARSON, Justice.

Appeal from the District Court of Duchesne County. Hereinafter, respondents, plaintiffs below, will be referred to as the County, and appellants, defendants below, will be called the Tax Commission. The action involved the constitutionality and meaning of Section 80-2-1, U. C. A. 1943 (R. S. U. 1933) and the construction and interpretation of Art. 13, Section 2, Constitution of the State of Utah. These constructions are basic in the consideration of the question presented to the trial court and raised on this appeal—Are lands title to which are in the State, and which were acquired by the state by foreclosure of a mortgage taken and held by the State Land Board, to secure money loaned from the State School Fund, or by conveyance in satisfaction of such mortgage, exempt from taxation? The facts are not in dispute. Under the Enabling Act, the Federal Government, at time of statehood, gave to the State of Utah, in trust, four sections of land in every township, the proceeds of which were to constitute a permanent fund, the interest of which, only, could be expended for the support of the common schools. By the State Constitution, the people of the State of Utah

accepted this gift as a trustee thereof. Section 3 of Article 10 of the Constitution reads:

"The proceeds of all lands that have been or may be granted by the United States to this State for the support of the common schools, * * * shall be and remain a perpetual fund, to be called the State school fund, the interest of which only, * * * shall be distributed among the several school districts. * * *"

By Chapter LXXX, Laws of Utah 1896, a State Board of Land Commissioners was created. Section 5 thereof, provides:

"The State Board of Land Commissioners shall have the direction, management and control of all lands heretofore or which may hereafter be granted to this state by the government, or otherwise, * * * and shall have power to sell or lease the same for the best interest of the state in accordance with the provisions of this Act, and the Constitution of the State."

Section 30 provides that all lands not sold shall be subject to lease.

Section 29 reads:

"The state board shall make the necessary orders for the investment or disposal of the funds derived from the sale or rental of public lands of the State in the State Treasury. Such funds shall be invested for * * * the specific purpose for which the lands were granted in government * * * bonds, or in first mortgages on improved farm lands within the state."

This chapter, unchanged in any substantial particulars on the matter here cited and involved, has been in force and effect since 1896. It now appears in U. C. A. Title 86. Pursuant to such statutory provisions, the board through sales and leases, have acquired a considerable fund, some of which has been invested in mortgage loans on farm property. In case of default, the mortgage is foreclosed, and if not redeemed, title to the property passes to the State as a result of the foreclosure sale. In some instances the State Land Board has accepted a deed to the state to the property in

lieu of foreclosure. There are approximately 17,000 acres of land in Duchesne County, title to which the state has acquired in this manner. Prior to the state acquiring title, this property was assessed, and subjected to taxes. After the state took legal title, the land was withdrawn from the tax rolls. The county brought this action for a writ of mandate to compel the County Assessor and the commission to place this property on the tax rolls and subject it to taxation. The trial court issued the writ and the commission appeals, presenting for our determination the question posed above.

The commission contends that under the provisions of Section 2 of Article 13 of the State Constitution, and of Section 80-2-1, U. C. A. 1943 (R. S. U. 1933), the lands in question being property of the state, are exempt from taxation. The county argues that the exemptions therein provided apply only to property which the state acquires and holds for the benefit of the public, that is, in its political or governmental capacity; and do not apply to property which the state acquires and holds as a result of an economic or business venture, or as an express trust for a specific purpose, and not for the public generally—that is, in what is generally called a private or proprietary capacity. The trial court upheld the county's construction.

The question here presented has never been raised in this jurisdiction before. Elaborate and well-prepared briefs have been submitted by both sides that challenge one's interest. Since the language of the constitutional provision and the statute last above cited seem to uphold the argument of the commission, we think the matter can be better explored when approached from the position of the county. The constitution, Article 13, Section 2, provides:

"All tangible property in the State, not exempt under the laws of the United States, or under this constitution, shall be taxed in proportion to its value, to be ascertained as provided by law. The property of the United States, of the State, counties, cities, towns, school districts, municipal corporations and public libraries, lots with the

buildings thereon used exclusively for either religious worship or charitable purposes, and places of burial not held or used for private or corporate benefit, shall be exempt from taxation.  *  *  *"

Article 13, Section 3, declares:

"The Legislature shall provide by law a uniform and equal rate of assessment and taxation *on all* tangible property in the State, according to its value in money, and shall prescribe by law such regulations as shall secure a just valuation for taxation *of such property,* so that *every person and corporation shall pay a tax in proportion to the value of his, her, or its* tangible property  *  *  *." (Italics ours.)

Pursuant to these provisions the Legislature enacted Sections 80-1-1, 80-2-1, 80-2-2, 80-2-4, U. C. A. 1943 (R. S. U. 1933). But since the statute must stand, and be construed in accordance with the constitution, and not the constitution in accordance with the statute, we shall not quote them at this time. Of course, if the position of the county is correct on the constitutional interpretation, the statute must fall, if it be construed as the commission construes it. If this property comes within the meaning of "property  *  *  * of the State," as the term is used in reference to exemptions from taxation, the commission proceeded properly under the statute as it is construed in *Stowell* v. *State et al.,* 100 Utah 420, 115 P. 2d 916.

From the arguments presented we formulate the following propositions as the contentions of the county and the position of the trial court: (a) By mandate of the constitution, all tangible property in the state is to be taxed, except that which is specifically exempted by, or under the provisions of the constitution. (b) The constitutional provision exempting state property from taxation, applies only to property which the state owns for public purposes, that is, in its governmental capacity. (c) The lands (four sections in each township) given by the Federal Government for the support of the common schools were given to the state in trust. That is, the state took title, not in its governmental capacity, but in a so-called proprietary capacity, as a trustee of an express

trust. (d) That when the state sold the lands, the state did not become the owner of the fund in its own right, but it continued with respect to the fund, as the trustee of an express trust. (e) That land, as soon as it comes into private ownership is impressed with the sovereign burden of taxability, which can only be taken away by express mandate of the constitution. (f) Lands involved in this action are not lands given the state in trust by the Enabling Act for the support of the common schools, but are lands which were in private ownership, and thereby impressed with the sovereign burden of taxability. (g) Since these lands had been impressed with the burden of taxability, that taxability could be removed under the constitution only if the state took title in its governmental capacity. (h) But since the land merely represents the fund, which the state holds merely as a trustee of an express trust, that is merely in a proprietary capacity, and the fact that naked legal title is in the state does not make it state property, so as to remove the taxable status.

We break or condense the questions posed above into three points for convenience in consideration and discussion: 1. Does the state hold the "state school fund" whether represented by land or money, in its own right, or merely as trustee of an express trust? 2. Does the state hold the title to this "fund" in its governmental capacity or merely in a proprietary one? 3. If in a proprietary capacity, is it property of the state, so as to come within the exemption clause of the constitution, quoted supra? We note them in order.

1. In this discussion, we shall hereafter use the term "fund" as embracing or meaning the revenues derived from the grant by the Federal Government of lands to the State of Utah for the support of the common schools, whether now in the form of moneys or lands, taken ■ over in settlement of mortgages for loans of such money. Should we desire to refer to only one, in a restricted sense, we will so indicate. The first question may be put this way: Does the state *own* the beneficial interest in this

fund, or does it merely administer it as a trustee for an express purpose? That the naked legal title to the fund is in the state in admitted. It is placed there by the Enabling Act (Sec. 6) and by the constitution of the state. This is also in accord with the general rule as to trusts. The legal title to the trust estate generally is vested in the trustee. The fund was offered and set up by the Federal Government in the Enabling Act, wherein the terms governing the same are stated. The proceeds from the sale of lands granted are made "a permanent * * * fund, the interest of which only shall be expended for the support of said schools." Section 10. Acceptance of this condition is made in the constitution in Article 10, Section 3, reading that "the proceeds of all lands * * * shall be and remain a perpetual fund, to be called the State School Fund, the interest of which only, * * * shall be distributed * * *." Section 7 declares that "all public School Funds shall be guaranteed by the State against loss or diversion." This embraces all the elements of an express trust, with the state the trustee, holding title only for the purpose of executing the trust; and is made the guarantor of the trust estate against loss. "A trust is a right of property, real or personal, held by one party for the benefit of another." Sears, Trust Estates, Section 1. It implies two interests, one legal, and the other equitable; the trustee holding the legal title or interest; and the cestui que trust or beneficiary holding the equitable title or interest. This being a charitable trust, or a public trust, it is not necessary that the cestui que trust be a definite or ascertainable being. *Trustees of New Castle Common* v. *Megginson*, 1 Boyce, Del., 361, 77 A. 565, Ann. Cas. 1914A, 1207; *Harrington* v. *Pier*, 105 Wis. 485, 82 N. W. 345, 50 L. R. A. 307, 76 Am. St. Rep. 924. The trust estate is definite, the trustee is certain, and the purpose of the trust and use of the fund is definite, certain and particularly characterized. This is sufficient. 5 R. C. L. 349. It must follow that the state holds the "fund" as a trustee of an express trust, limited in the amount, that can be expended, and the purposes and uses thereof.

2. Does the state, then, as trustee, hold title in its governmental capacity, or merely in a proprietary one? It is conceded that if the state holds title in its governmental capacity, the property is exempt from taxation under the constitutional mandate. Article 13, Sec. 2. There had crept into the decisions of the courts, and so into the texts, frequent statements that a public body does certain acts in its governmental capacity, and certain acts are done not in a governmental capacity, but merely in a proprietary one. It seems to be a distinction without a difference; an attempt to make one a "wife in name only." We have made diligent search for the origin of the doctrine, which we admit sometimes affords *easy outs*. It seems to have had an uncertain origin in the sovereignty of the king, which was borrowed from the Roman law. As stated in Pollock and Maitland, History of English Law, Vol. 1, p. 183:

> "The result of the Barons' War is to demonstrate that though the king is not above the law, the law has no means of punishing him, and no direct means of compelling him to make redress for the wrongs that he has done."

During the 16th century in England, we see the beginnings of the theory that the king could have two capacities. As stated in Holdsworth's History of English Law, Vol. 4, p. 207:

> "They (lawyers and statesmen) recognized that the king had a politic capacity, and that in that capacity he was the head and representative of the state. To that capacity certain powers were inseparably annexed—they were, that is, implicit in the idea of kingship, and therefore inseparable from the person of the king. As to the mode of user of some of these powers the king's discretion was free—he had an absolute prerogative. The mode of the user of others was prescribed by law. They could therefore be called ordinary because they were subject to the ordinary conditions of compliance with the law. The king himself was not amenable to the law, and the exercise of any of his absolute prerogatives could not be called in question in a law court. But, subject to these qualifications, both the extent of the prerogative and the mode of its user was subject to certain legal limitations which the law courts must interpret."

Thus, in the growth of the idea that though the king was not amenable to law, as he could not be sued in his own courts, nevertheless, some of his actions, in exercising some of his kingly prerogatives could be examined and called into question in the courts of law; appears the first idea that a government may function in two capacities. At the time of the theory set out above, the king was the head of the state, acted for it, and might in some instances, be called the state itself. Nevertheless, the theory grew up that he might also act in another, and what might be called a private capacity, and while he was not amenable to suit, even when acting in that capacity, his actions were subject to interpretation by law courts, and could be limited by the courts.

This doctrine that the sovereign cannot be sued in its own courts was carried over into the American law, as illustrated by an early Massachusetts case, *Mower* v. *Inhabitants of Leicester,* 9 Mass. 247, 6 Am. Dec. 63, where the court said:

"But quasi corporations, created by the legislature for purposes of public policy, are subject, by the common law, to an indictment for neglect of duties enjoined on them; but are not liable to an action for such neglect, unless the action be given by some statute."

The court then goes on, citing as authority for the statement that no such action would lie, *Russell et al.* v. *The Men of Devon,* 2 D. & E. 677, an early English case. There the court had said that the action would not lie against the inhabitants of a county because there was no defendant—no person to whom the judgment of the court might be directed, or from whom it might be collected. In the quoted case, the court was dealing with an incorporated town, so there was not this difficulty, but the error seems to have persisted, and the holding generally followed, creating the rule of law that a municipal corporation is not liable for negligence in performing governmental functions. See *Hill* v. *Boston,* 122 Mass. 344, 23 Am. Rep. 332, for a comprehensive review of American and English cases. Thus was the theory of sovereignty extended from the state to a corporation created by

the state. But as shown by the U. S. Supreme Court, it is not every state created corporation which will have this borrowed immunity. In *Bank of United States* v. *Planters' Bank of Georgia,* 9 Wheat. 904, 907, 22 U. S. 904, 6 L. Ed. 244, the court was discussing whether suit against a banking company of which a state was a stockholder must be brought originally in the Supreme Court because of the provision of the 11th amendment to the Federal Constitution that the Supreme Court should have original jurisdiction in cases by one state against another. The court there said:

"It is, we think, a sound principle, that when a government becomes a partner in any trading company, it divests itself, so far as concerns the transactions of that company, of its sovereign character, and takes that of a private citizen. Instead of communicating to the company its privileges and its prerogatives, it descends to a level with those with whom it associates itself, and takes the character which belongs to its associates, and to the business which is to be transacted. * * * The State of Georgia, by giving to the bank the capacity to sue and be sued, voluntarily strips itself of its sovereign character, so far as respects the transactions of the bank, and waives all the privileges of that character. As a member of a corporation, a government never exercises its sovereignty. * * * The government * * * lays down its sovereignty, so far as respects the transactions of the corporation, and exercises no power or privilege which is not derived from the charter."

Therefore, it follows that in order for the sovereignty of the state to be assumed by the corporation created by it, *this corporation must be one created for public or governmental purposes,* such as the case of municipal corporations. Even there, the courts have drawn distinctions, principally in tort cases, holding that when the city was engaged in what was called a "governmental" function, there was no tort liability, but when it was engaged in so-called "proprietary" functions, there was liability, just as upon any corporation. There is much diversity of opinion among the courts as to what functions are governmental, and what proprietary, and it would serve no useful purpose here to review the various cases laying down these distinctions. Sufficient

to say, that it appears to be a matter of what is generally being done by cities for the benefit of the people generally, that controls. As an example, there are early cases holding that the maintenance of a water system is proprietary in nature, while the later holdings, as cities more generally owned their water systems, are to the effect that such activities are governmental in nature.

Thus we see that the theory of sovereignty, and governmental and proprietary functions, was inherited, as it were, from another era, when there was a single man at the head of the government, who *was* the state, but with the development of a more complex form of state government, the old idea progressed, and it became increasingly difficult for the courts to follow the old theory, and still reach what they considered a just result in individual cases. There is no justification for, or need of this theory under the present functioning of our Federal or state governments. The King of England at the time of the development of the theory *was* the government, but he was also an individual, and so the necessity for distinguishing between his actions as King and those as an individual was very real. Under the American theory of government, however, government is not a thing imposed upon the people from above, but rather it is an organization created *by* the people for their own purposes, to wit, for governmental purposes. As such, the government has powers which are strictly limited by the constitution. This is true of both the Federal and the state governments. The State of Utah does not exist by divine right, nor was it created, nor does it exist by the will or whim of any man, prince, power, or potentate. It was conceived of dalliance between the Congress of the United States and the people of the Territory of Utah. The Congress passed an act, known as the Enabling Act, "to enable the people of Utah to form a constitution and State government." As a result thereof, the people of Utah conceived and gave birth to

Siamese twins: A constitution and the State of Utah, insep-
arable unless both shall die. They stated that,

"Grateful to Almightty God for life and liberty, *we, the people of
Utah,* in order to secure and perpetuate the principles of free govern-
ment, do ordain and establish this Constitution." (Italics added.)

It then declared that "all political power is inherent in the
people," article 1, § 2, that the government was founded
on their authority, and they could alter or change it as their
welfare required. Then followed the Bill of Rights, article
1, establishing a series of limitations on the government.
In Article V they said:

"The powers of government   *   *   *   shall be divided into three
distinct departments."

The legislative power was vested in the people of the State
of Utah, in whom all political power is inherent. It may be
exercised by the state legislature or the people directly. The
people reserved unto themselves the right to veto and annul
by referendum any acts of the legislature. Conditions were
laid down governing and controlling the legislature and the
way and time in which it could function. Article VI, Sec-
tions 26 to 31, inclusive, enumerate a series of further pro-
hibitions against action by the legislature, but which appar-
ently are not inhibitions against the same action by the
people, legislating directly. An executive department is
created to execute or carry into effect all legislative acts;
and a judicial department set up to which is committed all
judicial power which may be exercised by the government
created by the constitution. The constitution then imposes
certain mandatory duties upon the legislature, such as pro-
viding a system of public schools, colleges and universities;
protect labor, homesteads, and forests; it places limitations
on private corporations; on taxation and public debt; and
provides for transition from territorial government to the
new state government. Outside of references to its geo-

graphical location and boundary, the word state or State of Utah, refers to and means not a physical or tangible thing, but the government, the political unit, the governing instrumentality, set up by the constitution. It being the creation of the people, created and set up by them for specific purposes, is of necessity limited in its powers by the conditions and purposes of its creation. Under our set up, there is no entity of the state apart from its governmental powers and function. And since the state does not exist apart from its governmental duties, it cannot well perform acts or assert rights or have duties which are not a part or exercise of its governmental obligations or prerogatives. If it exists only governmentally, it cannot well have any capacity which is not governmental. It is a political entity, endowed by the instrument from which all its powers must come with political power or rights only and under which constitutional limitations were imposed. From what source then does it, or can it, derive any power or capacity to be, do or act in an activity or power which is not political, which is not within the measure of its creation, "to secure and perpetuate the principles of free government." Since this organization is created for the purpose of government how can anything that it does, which it had the power under the constitution to do, be anything but a governmental function? The power that the people gave to the state governments was political —they created in the state an agency for the purpose of government, so it must necessarily follow that any act of that organization is either a governmental act, or else an act which the people never gave the government the power to do.

One of the leading modern cases on this subject is *Riddoch* v. *State*, 68 Wash, 329, 123 P. 450, 452, 42 L. R. A., N. S.,

251, Ann. Cas. 1913E, 1033, where suit was brought for injuries sustained in an accident in a state building, which had been rented for the night to a private concern. In the course of the opinion, the court says:

"The appellant seeks to confine this rule of nonliability for torts to cases where the negligence of the officer or agent occurred in the discharge of some purely governmental function of the state. He contends that, in leasing the armory, the state was engaged in a private enterprise, and that the rule of nonliability therefore does not apply. The question is admittedly a new one. No authority distinctly so holding, nor indeed, recognizing such an exception, has been cited, and we have found none. It is argued that the distinction is sustained by analogy to a similar exception to the rule of nonliability as applied to municipal corporations. The analogy, however, does not hold. Municipal corporations enjoy their immunity from liability for torts only in so far as they partake of the state's immunity, and only in the exercise of those governmental powers and duties imposed upon them as representing the state. In the exercise of those administrative powers conferred upon or permitted to them solely for their own benefit in their corporate capacity, whether performed for gain or not, and whether of the nature of a business enterprise or not, they are neither sovereign nor immune. They are only sovereign and only immune in so far as they represent the state. They have no sovereignty of their own; they are in no sense sovereign per se. Their immunity, like their sovereignty, is in a sense borrowed; and the one is commensurate with the other. Such is, in effect the conclusion reached in *Hill* v. *Boston*, 122 Mass. 344, 23 Am. Rep. 332-367, after a most exhaustive review of the authorities. * * *

"On the other hand, the state is inherently sovereign at all times and in every capacity. It is the organized embodiment of the sovereign power of the whole people. By reason of this sovereignty, it possesses all powers, but only such powers, as are within the limitations of the state Constitution and without the prohibitions of the federal Constitution. It can do no act, except in the exercise of this sovereign power and within these constitutional limitations. If it may constitutionally take over any enterprise, though usually of the nature of a private business, the very taking over is an exercise of this sovereign power. It seems much more logical and much more consonant with the idea and genius of sovereignty that the enterprise thus taken over should be impressed with the sovereign character of the state, than that the state should become hampered by the private character of the enterprise. The latter result is incompatible with the concept of sovereignty."

We quote from *Lane* v. *Minnesota State Agricultural Soc.*, 62 Minn. 175, 64 N. W. 382, 29 L. R. A. 708:

"The state may and must commit the discharge of its sovereign political functions to agencies selected by it for that purpose. Such agencies, while engaged exclusively in the discharge of such public duties, do not act in any private capacity, but stand in the place of the state, and exercise its political authority. Therefore, when the state creates public corporations solely for governmental purposes, such corporations, while engaged in the discharge of the duties imposed upon them, for the sole benefit of the public, and from the performance of which they derive no compensation or benefit in their corporate capacity, are clothed with the immunities and privileges of the state; * * *."

The case most nearly in point, both in fact situation and law questions involved, with the one at bar, is *State* v. *Board of Commissioners of Beadle County*, 53 S. D. 609, 222 N. W. 583, 586. The situation is that the state, *under a constitutional amendment permitting it,* had engaged in the business of making rural credit loans secured by mortgages. A number of these mortgages had been foreclosed, and the commissioners of one of the counties of the state were contending that such land must remain taxable, even after mortgage foreclosure, because it was not gotten by the state in the exercise of its governmental function. There was also urged as an alternative contention, that the state was not the beneficial owner, because it held that land in trust, for the purpose of retiring the bonds issued to raise money for rural credit loans. In regard to this second proposition, the court says,

"it is undoubtedly true that a provision exempting state-owned property from taxation will not be held to exempt property to which the state holds mere legal title under circumstances such that the real beneficial interest is in third persons."

Deciding this question, the court says:

"If a tract of foreclosed land, or the proceeds thereof, is applied in payment of rural credit bonds, the bondholder is benefited in the sense that he receives money due him by virtue of his bond contract; but the state is equally benefited in the sense that its outstanding general

faith and credit obligations are pro tanto reduced. We are therefore of the opinion that, even upon the assumption that the title of the state to the real estate in question [or the proceeds thereof] is a trust title to enable said real estate or the proceeds thereof to be applied in payment of rural credit bonds, the performance of such trust would benefit the trustee equally with the beneficiary, and the trust would not be of such a nature as in and of itself to prevent the property from being tax exempt as state-owned property * * *."

In answering the first proposition, the court asks this question:

"Is there some sort of actual, legal difference, not as a matter of governmental theory, but as a matter of law, inherent in the nature of our institutions, in the capacity in which the government of this state functions in the performance of the various acts which the people of this state in their omnicompetence have determined to be proper for governmental functioning? In other words, does the government of this state in performing the functions devolved upon it by the will of the people of this state function sometimes as a sovereign government and sometimes as a nonsovereign government, as a necessary matter of law?"

Answering this question, the court says:

"No satisfactory line of demarcation is observable, and in the implications from what appears to us to be the better reasoned authorities we are not able to find support for such a distinction as applicable to a state government under our institutions. In the words of appellant's brief in this case, we think that, legally speaking, 'the state is the state.' Its functions are what the people of the state (always within the limits of the Federal Constitution) say they shall be. The fact that the people of this state may from time to time see fit to endow the government of the state with functions which it did not previously have, or with functions which hitherto may generally have been left to private enterprise rather than to governments, does not, legally speaking, affect the character or capacity in which the government acts in performing those functions when in fact they are devolved upon the state government by the people."

After quoting from *Riddoch* v. *State,* supra, the court quotes from *Ballaine* v. *Alaska, etc., R. Co.,* 9 Cir. 1919, 259 F. 183, 8 A. L. R. 990:

"Plaintiff * * * argues that in the operation and maintenance of the railroad the United States is carrying on a commercial business,

and in such business has, to an extent, abandoned its soverign capacity. We cannot uphold that view. Congress, in its power to regulate commerce, could construct, or could authorize a corporation or individuals to construct, a railroad, or to buy a railroad, and clearly, in the territories, has a plenary power to grant franchises, to create a railroad system, and to employ the agency of a corporation as a means of accomplishing such object. * * * Taking all these provisions together, they plainly show that the United States, in acquiring the stocks and bonds and property of the Alaska Northern Railway Company, acted in its sovereign capacity, and, in exercising entire control, possession, ownership, and management, has merely employed the corporate organization as an agency through which to execute the purposes of the statute."

Going on, the court (South Dakota) says:

"We are, therefore, of the opinion that the people of this state may give to the government of this state such powers as they see fit, always within the limits of the Federal Constitution. The purpose and the sole purpose of government in this state, in its actual operation, is to carry out the powers and perform the functions intrusted to it by the people of this state, and there is not, legally speaking, any distinction in the capacity in which the government of the state acts, or in the essential nature of its operation as a matter of law, in the performance of any one function intrusted to it by the people as compared with the performance of other functions so intrusted. We therefore hold that *there cannot be successfully maintained,* as a matter of law, in this state, under the circumstances here involved, *a distinction between what has been frequently denominated as a 'sovereign' and 'nonsovereign' capacity of the state."* (Italics added.)

This case is too recent (decided in 1928), and the fact situation too unusual, for it to have been widely cited, but in *Brams* v. *State,* 63 S. D. 571, 262 N. W. 89, 93, the court says:

"With these contentions of the state, we find ourselves unable to agree. * * * Pursuant to constitutional mandate of the people, the state of South Dakota entered the coal business, but it did not by so doing denude itself of sovereignty or become a private corporation. * * * It follows therefore that the state coal mining commission was a mere tool or agency or device of the sovereign state for the purpose of conducting and carrying on the coal mining business."

To summarize then in regard to the theories of sovereignty, and governmental and proprietary powers—the theory of sovereignty was originated in the days of the absolute kings in England, though even then there were some things in which the power of the king could be regulated and controlled by the courts. The doctrine was brought to the United States, and is firmly entrenched in our law—the sovereign cannot be sued without his consent. The principal application of the rule has been in the tort field, and particularly in the law of municipal corporations has grown up the idea that there are two different functions, or capacities in which the governing body can act—a governmental and a proprietary. As applied to the municipal corporation, it is acting in a governmental capacity when it is exercising power conferred upon it by the state, and when so acting it is acting as sovereign, that is in a governmental capacity. If it can exercise any power or function not given to it as a political or governmental agency, the municipal corporation might be said to act in a proprietary capacity, and would then be liable for the torts of its servants and agents, just as any private corporation. However, there is a question as to whether a municipal corporation can have any power except that conferred upon it as a governing unit. The state was created by the people therein for one purpose, and only one purpose, and that is political and governmental. Because the state is created for this purpose only, it can only act in a governmental capacity —that is, the only capacity in which the people, its creators, authorized it to act. True, its actions are limited by the State and Federal constitutions, but anything which it does, and can legally do under the provisions of those constitutions, must of necessity be a governmental function. In the very nature of things, the state has neither the authority, the capacity or the power to do anything other than governmental acts. Since the constitution created the state solely for governmental purposes, any right, duty or obligation it imposes upon the state, must ipso facto be a governmental

one. Here the trusteeship of the fund was vested in the state by the Enabling Act as a condition of statehood, as a condition to the right of the state to be born, and imposed upon the state at its birth by the instrument of its creation as a condition of its life as a government. It must therefore be held by the state in a governmental capacity. It therefore comes within the constitutional exemption from taxation as property of the state.

From what has been said, the third question becomes moot.

The judgment is reversed and the cause remanded with directions to dismiss the petition.

MOFFAT, J., concurs.

WOLFE, Chief Justice, (concurring in result).

I concur in the result. The decision develops the thesis that all functions constitutionally performed by the state or one of its agencies created for governance are ipso facto governmental and cannot be otherwise; hence that the division between governmental and proprietary functions is artificial. While I can express considerable sympathy with this idea as indicated by my opinion in the case of *Lehi City* v. *Meiling,* 87 Utah 237, 48 P. 2d 530, I do not think it the necessary route through which our reasoning must go to decide this case. Certainly there is a difference in the nature of functions which the state may perform whether they all be called governmental or some be classified as governmental and some proprietary. And the concept of governance has, in the past, been one of limited connotation. The pragmatic reason for the classification lies largely in the effort to escape from the sovereign's immunity from suit where, in justice, it is felt that the state should respond. The basis of my concurrence is that lands, title to which is acquired by the state by foreclosure of mortgage or conveyance for extinguishment of a debt for money loaned from the State School Fund, are exempt from taxation because they are within the meaning

of the words "property  *  *  *  of the State" as used in Sec. 2 of Art. 13 of our Constitution. I must reject the idea that once having been in private hands and therefore impressed with amenability to taxation, they retain such amenability when they come into the hands of the state unless held for purposes of governing, or for what is generally conceived of as a public purpose. Moreover, carrying on the process of education is a public venture which is thought of as a governmental function even in the more limited meaning of that phrase.

McDONOUGH, Justice (concurring in result).

I concur in the order reversing the judgment. I do so on the ground that the Constitution of the State of Utah provides that

"The property  *  *  *  of the state  *  *  *  shall be exempt from taxation."

Land, the title to which is acquired by the state, by foreclosure or grant, is property of the state. The framers of the constitution did not expressly or by implication limit the exemption of state property to that acquired in any particular manner or for any particular purpose. Therefore, we need inquire no further, in determining the taxability of these lands, than to find whose property they are. Finding that they are the property of the state requires a declaration that they are exempt from taxation.

WADE, Justice (concurring in result).

I concur in the result on the ground that this is the kind of property that was intended under our constitution and statutory provision to be exempt from taxation, it being held in trust for the benefit of the schools, and it is immaterial whether it is held in a governmental or proprietary capacity, and whether it was once subject to taxation or not.