Richard B. JENSEN, as State Auditor of
the State of Utah, Plaintiff
and Appellant,

v.

William K. DINEHART, as Director of the
Division of State Lands of the State of
Utah, Defendant and Respondent.

No. 16832.

Supreme Court of Utah.

March 10, 1982.

David L. Wilkinson, Atty. Gen., Denise A. Dragoo, Sp. Asst. Atty. Gen., Salt Lake City, for plaintiff and appellant.

David L. Wilkinson, Atty. Gen., Michael L. Deamer, Deputy Atty. Gen., Salt Lake City, for defendant and respondent.

HALL, Chief Justice:

Plaintiff appeals the declaratory judgment of the Third Judicial District Court that mineral proceeds derived from state school lands must be deposited and retained in the State School Fund,[1] also referred to as the perpetual fund, rather than the Uniform School Fund,[2] which is currently expendable.

Defendant, as the Director of the Division of Utah State Lands, administers the school section lands granted to the state by acts of the United States Congress of 1894 and 1927. He places the proceeds therefrom in the State School Fund. Only the interest drawn thereon is placed in the Uniform School Fund for operational use. Plaintiff, the State Auditor, asserted that the mineral proceeds derived from said lands should be deposited in the currently expendable Uniform School Fund and thereafter sought a declaratory judgment in support of his conclusion. The trial court rejected his contention and granted defendant's motion for summary judgment.

1. A perpetual fund provided for by Article X, Section 3, Constitution of Utah (1896).

2. An operational fund provided for by Article X, Section 3, Constitution of Utah (as amended, 1939).

Plaintiff's contentions are that the trial court incorrectly interpreted the Utah Enabling Act[3] and the Act of January 25, 1927,[4] and that both legal and practical considerations dictate that mineral proceeds be deposited in the currently expendable Uniform School Fund instead of being committed to the perpetual State School Fund. The issue for resolution here is whether mineral proceeds from lands received by this state for the support of the public schools must be deposited in the latter fund, from which only the interest earned thereon may be expended to support the public schools, or be deposited in the former fund and currently expended to meet public school needs.

The background leading to congressional enactment of state school land grant statutes was well stated in *Utah v. Kleppe*[5] as follows:

> There were no federal lands within the borders of the original thirteen states when they adopted and ratified the United States Constitution. Thus, virtually all of the lands within their borders were subject to taxation, including taxation necessary for the maintenance of their public school systems. When other states were subsequently admitted into the Union, their territorial confines were "carved" from federal territories. The "public lands" owned and reserved by the United States within those territorial confines were not subject to taxation. This reservation by the United States created a serious impediment to the "public land" states in relation to an adequate property tax base necessary to permit these states to operate and maintain essential governmental services, including the public school systems. It was in recognition thereof, i.e., in order to "equalize" the status of the newly admitted states with that of the original thirteen states, that the Congress enacted the federal land grant statutes.... *to be held and administered by the states under*

> *trust covenants for the perpetual benefit of the public school systems.*

(All emphasis in this opinion is added.)

If the mineral proceeds derived from state school lands are required to be placed in the perpetual fund as asserted by the defendant, it would be because they were thus committed in irrevocable trust for that purpose by the provisions of the Utah Enabling Act[6] and the Utah Constitution discussed herein.

The Utah Enabling Act authorized the people of Utah to form a constitution and state government; and to be admitted into the Union on an equal footing with the original states (except as may be limited or conditioned by the Enabling Act.) Section 3 of said Act specifically required the State of Utah to adopt an irrevocable commitment for:

> ... the establishment and maintenance of a system of public schools, which shall be open to all the children of said State and free from sectarian control.

Section 6 thereof provided:

> That upon the admission of said State into the Union, sections numbered two, sixteen, thirty-two, and thirty-six in every township of said proposed State ... are hereby granted to said State for the support of common schools.

Section 10 of the Enabling Act then imposed the specific conditions on the use and disposition of the school land grant contained in Section 6:

> ... the *proceeds of lands* herein granted for education purposes, except as hereinafter otherwise provided, shall constitute *a permanent school fund,* the interest of which only shall be expended for the support of said schools ....

The State of Utah accepted the conditions and obligations of the grant of federal lands for the support of the public schools by its adoption of the following constitutional provision:

---

**3.** Act of July 16, 1894, 28 Stat. 107.

**4.** 44 Stat. 1026, 43 U.S.C. Section 870 *et seq.*

**5.** 586 F.2d 756 (10th Cir. 1978).

**6.** *Supra,* footnote 3.

The *proceeds of all lands* that have been, or may be granted by the United States to this State, for the support of the common schools; the proceeds of all property that may accrue to the State by escheat or forfeiture; all unclaimed shares and dividends of any corporation incorporated under the laws of this State; the *proceeds of the sale of timber, minerals or other property from school and State lands*, other than those granted for specific purposes; ... *shall be and remain a perpetual fund, to be called the State School Fund*, the interest of which only, ... shall be distributed among the several school districts according to the school population residing therein.[7]

It will be noted that the Enabling Act neither expressly included nor excluded mineral lands from its grant of federal lands to the State of Utah. However, in 1918, the United States Supreme Court, in *United States v. Sweet*,[8] ruled that it had not been the intention of Congress to grant to the State of Utah by its Enabling Act school sections known to have been mineral in character. Arising out of and consistent with that ruling, there was considerable litigation with respect to titles to mineral lands in various states. It is of interest to observe that some state enabling acts expressly stated that mineral sections, as well as nonmineral sections, passed to the state. See, e.g., Enabling Act of Oklahoma, Ch. 3335, 34 Stat. 267, 273 (1906), while other enabling acts expressly excepted mineral lands from the school grants. Still other enabling acts, similar to Utah's, had made no express mention of mineral lands. It was with respect to them that problems arose. In some instances, state conveyances of land were challenged long after the initial state conveyance, based on the contention that the lands had been known to be mineral lands at the time of the grant, or of the approval of the survey.

In an effort to deal with the difficulties which had arisen, in 1927 Congress enacted what is known as the Jones Act,[9] which expressly extended the school land grants to include sections mineral in character. Applicable provisions of that Act are:

... the several grants to the States of numbered sections in place for the support or in aid of common or public schools be, and they *are hereby, extended to embrace numbered school sections mineral in character* ...

\*     \*     \*     \*     \*     \*

The additional grant made by this section is upon the express condition that all sales, grants, deeds, or patents for any of the *lands so granted shall hereafter be subject to and contain a reservation to the State of all the coal and other minerals in the lands* so sold, granted, deeded, or patented, together with the right to prospect for, mine, and remove the same. *The coal and other mineral deposits* in such lands not heretofore disposed of by the State *shall be subject to lease by the State as the State legislature may direct*, the proceeds and rentals and royalties therefrom *to be utilized for the support or in aid of the common or public schools:*

...

■ In order to harmonize with and take advantage of the more liberal grant by Congress in the Jones Act, in 1939, Utah amended Article X, Section 3 of our Constitution. That section as amended states:

The proceeds of the sales of all lands that have been or may hereafter be granted by the United States to this state, for the support of the common schools, ... shall be and remain a permanent fund, to be called the State School Fund, the interest of which only, shall be expended for the support of the common schools. The interest on the State School Fund, the proceeds of all property that may accrue to the state by the escheat or

---

7. Article X, Section 3, Constitution of Utah (1896).

8. 245 U.S. 563, 38 S.Ct. 193, 62 L.Ed. 473 (1918).

9. Act of January 25, 1927, *supra*, footnote 4.

forfeiture, all unclaimed shares and dividends of any corporation incorporated under the laws of this state, the proceeds of the sales of timber, *and the proceeds of the sale or other disposition of minerals* [10] or other property from school and state lands, other than those granted for specific purposes, *shall,* with such other revenues as the Legislature may from time to time allot thereto, *constitute a fund to be known as the Uniform School Fund, which* Uniform School Fund *shall be maintained* and used for the support of the common and *public* schools of the state *and apportioned in such manner as the Legislature shall provide.*

■ Under the adjudication in the case of *United States v. Sweet, supra,* that the grant of school sections did not include known mineral sections, it reasonably follows that the Enabling Act did not commit the proceeds of minerals to the permanent school fund; and this is corroborated by the manner in which Utah in 1896 treated the proceeds of minerals, separately from the proceeds of lands, in Section 3 of Article X of its Constitution.[11] In any event, from the provision of the Jones Act that the grants of the school sections are "extended to embrace numbered school sections mineral in character," it seems plain that the purpose of that Act was to nullify the effect of the decision in the *Sweet* case by completely freeing those federally granted school sections 2, 16, 32 and 36 from any restriction or limitation that may have theretofore existed, except as to use for public schools.

■ As a sovereign state, it was free and unfettered to place mineral proceeds from the school sections in the Uniform School Fund;[12] and we see no reason to believe that that conclusion is not just as valid as to sections acquired prior to the Jones Act and the 1939 amendment as it is to those acquired thereafter. It is therefore our opinion that the mineral proceeds from the school sections are properly placed in the Uniform School Fund, whenever such sections were acquired by this state.

Remanded for entry of judgment in conformity herewith. No costs awarded.

STEWART and HOWE, JJ., and J. ALLAN CROCKETT, Retired Justice, concur.

OAKS, Justice (concurring and dissenting):

Many of the school sections the state received under the Utah Enabling Act of 1894, 28 Stat. 107, contained minerals. Some of these sections were known to contain minerals at the time they were surveyed; others were not known to contain minerals at that time. This difference became critical when the United States Supreme Court held that the state of Utah received no title to school sections "known to be mineral in character," *United States v. Sweet,* 245 U.S. 563, 572–73, 38 S.Ct. 193, 195, 62 L.Ed. 473 (1918), "at the time of the approval of the survey . . . ." *Utah v. Bradley Estates Inc.,* 223 F.2d 129, 131 (10th Cir. 1955), cert. denied 350 U.S. 841, 76 S.Ct. 80, 100 L.Ed. 749 (1955); *Andrus v. Utah,* 446 U.S. 500, 508, 100 S.Ct. 1803, 1807, 64 L.Ed.2d 458 (1980). The school sections withheld from the state by the *Sweet* decision were granted to the state by "an additional grant" in the Jones Act of 1927, 44 Stat. 1026, ch. 57(b).

Because of this history, school sections currently owned by the state of Utah that contain minerals were necessarily acquired in one of two ways.

---

**10.** Although this provision permits sales of minerals, U.C.A., 1953, 65-1-15 reserves minerals from sale, except on a rental or royalty basis, which is consistent with the congressional grant.

**11.** If the framers had considered the phrase "proceeds of lands" in the beginning of that paragraph as including proceeds from minerals, it would have been repetitious and unnecessary to again mention the proceeds of minerals in connection with escheats, unclaimed shares of corporations, timber and other property.

**12.** That a sovereign state has all powers of government except as constitutionally limited, see statement in *Wood v. Budge,* 13 Utah 2d 359, 374 P.2d 516 (1962).

If school sections were known to contain minerals at the time of the approval of their survey, the *Sweet* decision establishes that they did not pass to the state under the Enabling Act. Title to those sections must have been acquired under the "additional grant" of the Jones Act in 1927. Exercising the significant latitude granted to the state by the Jones Act, the Utah Constitution, Art. X, § 3, validly prescribes that the proceeds of mineral development on these sections shall be deposited in the Uniform School Fund for current expenditure. As to these lands, I concur with the judgment of the majority.

If school sections were *not* known to contain minerals at the time of the approval of their survey (even though they actually did), their ownership must have been acquired under the Enabling Act of 1894.[1] There were doubtless many such sections, including sections containing substances like oil shale not then known to be valuable for development as minerals.

Lands acquired under the Enabling Act are subject to the restriction in section 10 of that Act (quoted by the majority) that their "proceeds" must be deposited in a perpetual fund (i.e., the State School Fund), with only the interest available for current expenditure.[2] These school sections are held in trust by the state of Utah for the purposes and upon the restrictions stated in the Enabling Act. *Duchesne County v. State Tax Commission*, 104 Utah 365, 366–67, 140 P.2d 335 (1943); *Lassen v. Arizona*, 385 U.S. 458,

460–61, 469, 87 S.Ct. 584, 585, 590, 17 L.Ed.2d 515 (1967). Consequently, under the governing federal law, the state could not validly appropriate the proceeds of these lands to current expenditure, as it attempted to do in Article X, § 3 of our Constitution, effective in 1939. Thus, a 1955 amendment to the Oklahoma Constitution was held in conflict with the Oklahoma Enabling Act and therefore invalid when it purported to authorize mineral royalties to be deposited in an operating fund rather than a permanent fund. *Oklahoma ex rel. Williamson v. Commissioners of Land Office*, Okla., 301 P.2d 655 (1956).

By its general references to "mineral lands" and "mineral sections," the majority glosses over the essential distinction between mineral lands received under the Enabling Act of 1894, which are subject to the perpetual fund restriction, and mineral lands received under the Jones Act of 1927, which are not. As to the lands received under the Enabling Act, I dissent from the majority's decision that their proceeds are free from the perpetual fund restriction.

Under familiar trust principles, the creator of the trust on school lands received under the Enabling Act (Congress) and the representatives of the beneficiaries of the trust (responsible officials of the state of Utah) might unite to free those lands from their trust restriction. But neither the language nor the legislative history of the Jones Act shows any intent to achieve that result. Its terms were expressly denoted

1. This is the rule that has been applied under other federal land grants expressly reserving "lands valuable for minerals." *Deffeback v. Hawke*, 115 U.S. 392, 404–5, 6 S.Ct. 95, 100–01, 29 L.Ed. 423 (1885). Utah's receipt of ownership under the Enabling Act of school sections not known to contain minerals at the time of their survey but actually containing coal was the basis of the United States Supreme Court's decision in *Work v. Braffet*, 276 U.S. 560, 562, 48 S.Ct. 363, 364, 72 L.Ed. 700 (1928).

2. The reference to "proceeds" in section 10 required the permanent school fund to receive all proceeds from the sales of school sections and all royalties and other payments (such as bonuses or delay rentals) from or related to the severance of mineral or other natural resources from school sections. Income issuing from the land on an annual basis, such as annual rentals on a grazing lease, would not be deposited in the permanent fund, since this type of income would be similar to the interest from the fund, which could be expended annually for the support of the schools. This allocation of receipts, familiar in the division of mineral revenues between annual income and permanent fund, 3A W. Summers, Oil & Gas § 613, p. 502 (1958), has been applied in precisely this sort of controversy to require the deposit of all proceeds received from mineral development on a school section (bonus payments and delay rentals as well as royalties) to the state's permanent school fund. *School District No. 23 v. Commissioners of Land Office*, 166 Okl. 226, 27 P.2d 149 (1933).

an "additional grant," and its evident purpose was to grant states the additional school sections that had not passed under the Enabling Act because of the *Sweet* decision. H.R.Rep.No.1761, 69th Cong., 2d Sess. 1 (1927). There are no words in the Jones Act or its legislative history that exhibit any intent to remove or modify the trust restriction Congress had imposed on sections granted under the Enabling Act.

For the reasons set out above, I am in agreement with the reasoning of the persuasive memorandum opinion Judge Christine Durham filed in the Third District in this case, insofar as it pertains to the school sections received under the Enabling Act of 1894.[3]

The difficulties of classifying which school sections were received under the Enabling Act and which were received under the Jones Act (i.e., which were not known to contain minerals at the time of their survey and which were known to contain minerals) should be minimized by the fact that this controversy does not involve the rights of any private parties. This is a controversy between two different arms of state government. These contestants should be able to compose most issues of fact amicably and in the public interest by a consent decree for consideration, modification (if needed), and entry by the court. I would remand for that determination.

---

3. Judge Durham's opinion reads in pertinent part as follows:

This action concerns the proper disposition of proceeds of mineral lands which passed to the State of Utah under the Enabling Act of July 16, 1894, by virtue of the fact that the lands were not known to be valuable for minerals at the time. The Enabling Act provided that the proceeds of land granted for public school purposes should constitute a "permanent school fund." This Court is persuaded that Congress did not modify or alter that grant by subsequent acts or statutes, or by implication therein and that the Utah Legislature violated the terms of the Enabling Act by amending its Constitution in 1939 to provide that mineral proceeds from state public school lands should go to the uniform school fund for operational use. Pursuant to the binding terms of the Enabling Act, the proceeds of public school lands which come from revenue from minerals in the lands should be maintained in a permanent school fund. . . .