TRUSTEES FOR ALASKA, Nunam Kitlutsisti, Dinyea Corporation, Village of Minto, Alaska Independent Fishermen's Marketing Association, Alaska Center for the Environment, Southeast Alaska Conservation Council, Friends of the Earth, Plaintiffs/Appellants,

v.

STATE of Alaska, Alaska Department of Natural Resources, Esther Wunnicke, Commissioner, Department of Natural Resources, Defendants/Appellees,

Alaska Miners Association, Fairbanks North Star Borough and Joseph E. Vogler, Defendants-Intervenors/Appellees.

No. S–1142.

Supreme Court of Alaska.

May 1, 1987.

Eric Smith and Robert W. Adler, Anchorage, for plaintiffs/appellants.

Robert M. Maynard and Mark P. Worcester, Asst. Attys. Gen., Anchorage, Harold M. Brown, Atty. Gen., Juneau, for defendant/appellee State of Alaska, Alaska Dept. of Natural Resources, and Esther Wunnicke, Com'r, Dept. of Natural Resources.

James N. Reeves, Bogle & Gates, Anchorage, for defendant/appellee Alaska Miners Ass'n.

Ronald A. Zumbrun, Robin L. Rivett, and James S. Burling, Pacific Legal Foundation, Sacramento, Cal., and Michael B. Markham, Borough Atty., Fairbanks, for defendant/appellee Fairbanks North Star Borough.

Thomas R. Wickwire, Fairbanks, for defendant/appellee Joseph E. Vogler.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MATTHEWS, Justice.

Alaska was granted the right to select 103,350,000 acres of land from the United States under section 6(a) and (b) of the Alaska Statehood Act, Pub.L. No. 85–508, 72 Stat. 339 (1958) (set out in a note preceding 48 U.S.C. § 21 (1982)). Mineral deposits in selected lands were also conveyed, subject to certain restrictions. Section 6(i) of the Act provides:

> All grants made or confirmed under this Act shall include mineral deposits. The grants of mineral lands to the State of Alaska under subsections (a) and (b) of this section are made upon the express condition that all sales, grants, deeds, or patents for any of the mineral lands so granted shall be subject to and contain a reservation to the State of all of the minerals in the lands so sold, granted, deeded, or patented, together with the right to prospect for, mine, and remove the same. Mineral deposits in such lands shall be subject to lease by the State as the State legislature may direct: *Provided,* That any lands or minerals hereafter disposed of contrary to the provisions of this section shall be forfeited to the United States by appropriate proceedings instituted by the Attorney General for that purpose in the United States District Court for the District of Alaska.

This case presents issues concerning the meaning of the section 6(i) grant and restrictions, and of appellants' standing to bring an action in state court to construe the meaning of the Alaska Statehood Act.

## I. PROCEEDINGS BELOW

The appellants are a coalition of environmental, Native, and fishing groups. They filed an action in superior court seeking a declaration that the state's mineral leasing system violates section 6(i) in that the state does not require payment of either rent or royalties in leases of lands subject to section 6(i), and that the state has incorrectly construed the section 6(i) restrictions to apply only to lands known to contain minerals at the time of state selection rather

than to all selected lands which contain minerals.[1]

All parties moved for summary judgment. The trial court ruled that the appellants did not have standing, that section 6(i) is enforceable only by the Attorney General of the United States, and that the state's mineral management system does not violate section 6(i). The court did not rule on the question whether the section 6(i) restrictions apply to all state-selected lands containing minerals or merely to those known to contain minerals at the time of selection.

We conclude that appellants have standing to maintain this declaratory judgment action, that the state's mineral leasing system violates section 6(i) because it does not require the payment of rent or royalties on mining leases, and that section 6(i) applies only to those lands known to have been mineral in character at the time of state selection.

## II. STANDING TO MAINTAIN DECLARATORY JUDGMENT ACTION

### A. *Standing*

■ "Standing questions are limited to whether the litigant is a 'proper party to request an adjudication of a particular issue....' " *Moore v. State*, 553 P.2d 8, 24 n. 25 (Alaska 1976) (quoting *Flast v. Cohen*, 392 U.S. 83, 100–01, 88 S.Ct. 1942, 1952–53, 20 L.Ed.2d 947, 961 (1968)). Standing in our state courts is not a constitutional doctrine; rather, it is a rule of judicial self-restraint based on the principle that courts should not resolve abstract questions or issue advisory opinions. *Id.* The basic requirement for standing in Alaska is adversity. *Id.*

The concept of standing has been interpreted broadly in Alaska. We have "departed from a restrictive interpretation of the standing requirement," *Coghill v. Boucher*, 511 P.2d 1297, 1303 (Alaska 1973), adopting instead an approach "favoring increased accessibility to judicial forums." *Moore v. State*, 553 P.2d at 23; *see also State v. Lewis*, 559 P.2d 630, 634 n. 7 (Alaska) (and cases cited therein), *cert. denied*, 432 U.S. 901, 97 S.Ct. 2943, 53 L.Ed.2d 1073 (1977). Our cases have discussed two different kinds of standing. One is interest-injury standing; the other is citizen-taxpayer standing.

■ Under the interest-injury approach, a plaintiff must have an interest adversely affected by the conduct complained of. Such an interest may be economic, *Moore*, 553 P.2d at 24; *Wagstaff v. Superior Court, Family Court Division*, 535 P.2d 1220, 1225 (Alaska 1975), or it may be intangible, such as an aesthetic or environmental interest. *Lewis*, 559 P.2d at 635. The degree of injury to the interest need not be great; " '[t]he basic idea ... is that an identifiable trifle is enough for standing to fight out a question of principle; the trifle is the basis for standing and the principle supplies the motivation.' " *Wagstaff*, 535 P.2d at 1225 & n. 7 (quoting Davis, *Standing: Taxpayers and Others*, 35 U.Chi.L.Rev. 601, 613 (1968)).

In the instant case, the appellants assert that they have standing as citizens or taxpayers, rather than because their interests are injured. In prior cases, we have often permitted taxpayers or citizens to challenge governmental action based on their status as taxpayers or citizens. In many such cases, standing has been assumed and not discussed.[2] We have, however, explic-

---

1. Appellants also contend that section 6(i) has become part of the Constitution of Alaska, and has created public trust duties. Thus, appellants argue, to the extent that section 6(i) has been violated, so has the Alaska Constitution and the public trust.

2. *E.g., Thomas v. Bailey*, 595 P.2d 1 (Alaska 1979) (land grant initiative challenged by citizens and taxpayers); *Abrams v. State*, 534 P.2d 91 (Alaska 1975) (taxpayer and citizen suit challenging legislative formation of Eagle River-

Chugiak Borough); *Boucher v. Engstrom*, 528 P.2d 456 (Alaska 1974) (citizen suit to enjoin placement of capital move initiative on ballot); *Boucher v. Bomhoff*, 495 P.2d 77 (Alaska 1972) (citizen challenge to the wording of a referendum question); *Jefferson v. Asplund*, 458 P.2d 995 (Alaska 1969) (taxpayer suit challenging public professional service contract); *Jefferson v. Greater Anchorage Area Borough*, 451 P.2d 730 (Alaska 1969) (taxpayer suit challenging a bond issue); *Suber v. Alaska State Bond Committee*, 414 P.2d 546 (Alaska 1966) (taxpayer suit

itly addressed taxpayer-citizen standing on other occasions. For example, in *Coghill v. Boucher*, 511 P.2d 1297 (Alaska 1973), registered voters (one of whom was also a poll watcher) were allowed to challenge certain proposed vote-counting procedures. In finding standing, we stated:

> In the case at bar, we conclude that a retreat to restrictive notions of standing, as urged by appellee, would not advance the public's vital interest in maintenance of the integrity of vote-tallying procedures during statewide elections. Denial of standing to appellants in the instant case would have the effect of unduly limiting the possibility of a popular check upon executive control of the election process. If registered voters and poll watchers are foreclosed from seeking judicial review of administrative regulation of this sensitive aspect of our governmental system, then it may well be that any review of executive activity in this area would be completely foreclosed, particularly in the event that candidates or political parties were unwilling to challenge such administrative actions. We decline to restrict the public's access to Alaska's courts in such a manner.

*Id.* at 1304.

We also discussed the question of taxpayer standing in *Lewis*, 559 P.2d 630. At issue was the legality of a three-way land trade between the state, the federal government, and a native regional corporation. Our characterization of the plaintiffs' interest in *Lewis* applies in this case. "Here, plaintiffs are seeking to protect mineral resources in land originally selected from the federal government under the Statehood Act. Their interest in the state's retention of mineral rights in state lands is no less significant than the aesthetic and environmental values sought to be vindicat-

ed in *Sierra Club* [*v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)] and [*United States v.*] *SCRAP* [,412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973)]." 559 P.2d at 635. We declined to decide whether standing should be allowed in all taxpayer or citizen actions, but we allowed taxpayer standing in *Lewis*. Several factors influenced our conclusion: the land transfer allegedly violated specific constitutional limitations, the transfer was significant in size and in its potential economic impact on the state, and no one seemed to be in a better position than the plaintiffs to complain of the illegality of the transaction. *Id.*

In *Carpenter v. Hammond*, 667 P.2d 1204 (Alaska), *appeal dismissed*, 464 U.S. 801, 104 S.Ct. 45, 78 L.Ed.2d 67 (1983), we affirmed, in an alternative holding, the standing of a citizen to challenge the reapportionment of a House District in which she did not reside or vote. We stated:

> In the instant case, Carpenter alleges that District 2 violates a specific constitutional limitation and that the disputed transaction (the drawing of election district lines) arguably will have a significant impact on the state. Here the dispute over District 2 has been fully briefed, argued at trial and on appeal, and there is no one in a better position than Carpenter to litigate these issues. In our view, Carpenter also meets the standing criteria of *Lewis*.

*Id.* at 1210 (footnote omitted).

*Gilman v. Martin*, 662 P.2d 120 (Alaska 1983), involved a challenge to a municipal sale of land. We upheld taxpayer standing, stating that "[a]ny resident or taxpayer of a municipality has a sufficient interest in the disposition of a significant number of acres of the municipality's land to

challenging public mortgage adjustment program); *Walters v. Cease*, 394 P.2d 670 (Alaska 1964) (citizen suit to enjoin referendum relating to formation of local government units); *DeArmond v. Alaska State Development Corporation*, 376 P.2d 717 (Alaska 1962) (taxpayer suit challenging the legality of public corporation); *Starr v. Hagglund*, 374 P.2d 316 (Alaska 1962) (citizen suit to enjoin capital move initiative).

Some of these cases were subsequently recognized as taxpayer standing suits. *See K & L Distributors, Inc. v. Murkowski*, 486 P.2d 351, 353 n. 1 (Alaska 1971) (characterizing *Jefferson v. Asplund*, 458 P.2d 995, and *Greater Anchorage Area Borough v. Porter and Jefferson*, 469 P.2d 360 (Alaska 1970), as taxpayer standing actions); *Moore*, 553 P.2d at 24 n. 26 (citing *Jefferson v. Greater Anchorage Area Borough*, 451 P.2d 730, as an example of taxpayer standing).

seek a declaratory judgment as to the validity of the disposition." *Id.* at 123.

In *Hoblit v. Commissioner of Natural Resources,* 678 P.2d 1337 (Alaska 1984), we held that plaintiff did not have standing as a taxpayer to challenge the sale of some twenty acres of state land. We distinguished *Gilman* on the grounds that the amount of acreage involved in *Hoblit* was not "significant." 678 P.2d at 1341. Similarly, we distinguished *Lewis* because the " 'magnitude of the transaction and its potential economic impact on the State' which were determinative in *Lewis* are simply lacking here." *Id.* We remanded for a determination as to whether or not the plaintiff had standing because of his status as an adjoining land owner. *Id.* at 1341–42.

■ This review of taxpayer-citizen standing in Alaska clearly demonstrates that taxpayer-citizen status is a sufficient basis on which to challenge allegedly illegal government conduct on matters of significant public concern. Taxpayer-citizen standing has never been denied in any decision of this court, except on the basis that the controversy was not of public significance,[3] or on the basis that the plaintiff was not a taxpayer.[4] However, *Lewis* and *Carpenter* suggested, without deciding, that taxpayer-citizen standing may be denied even in cases of public significance under certain circumstances.[5]

■ In our view, taxpayer-citizen standing cannot be claimed in all cases as a matter of right. Rather, each case must be examined to determine if several criteria have been met. First, the case in question must be one of public significance.[6] On measure of significance may be that specific constitutional limitations are at issue, as in *Carpenter* and *Lewis.* That is not an exclusive measure of significance, however, as statutory and common law questions may also be very important.[7] Second, the plaintiff must be appropriate in several respects. For example, standing may be denied if there is a plaintiff more directly affected by the challenged conduct in question who has or is likely to bring suit. The same is true if there is no true adversity of interest, such as a sham plaintiff whose intent is to lose the lawsuit and thus create judicial precedent upholding the challenged action.[8] Further, standing may be denied

---

**3.** *Hoblit,* 678 P.2d 1337.

**4.** *Greater Anchorage Area Borough v. Porter and Jefferson,* 469 P.2d 360.

**5.** The Utah Supreme Court relied in part on *Lewis* and adopted a discretionary denial approach in *Jenkins v. Swan,* 675 P.2d 1145, 1150–51 (Utah 1983):

> If the plaintiff does not have standing under the first step [that is, interest-injury standing], we will then address the question of whether there is anyone who has a greater interest in the outcome of the case than the plaintiff. If there is no one, and if the issue is unlikely to be raised at all if the plaintiff is denied standing, this Court will grant standing. *See, e.g., State v. Lewis,* Alaska, 559 P.2d 630, 635 (1977). When standing is predicated on the assertion that the issues involve "great public interest and societal impact," we will retain our practical concern that the parties involved have the interest necessary to effectively assist the court in developing and reviewing all relevant legal and factual questions. The Court will deny standing when a plaintiff does not satisfy the first requirement of the analysis and there are potential plaintiffs with a more direct interest in the issues who can more adequately litigate the issues.

> The third step in the analysis is to decide if the issues raised by the plaintiff are of sufficient public importance in and of themselves to grant him standing. The absence of a more appropriate plaintiff will not automatically justify granting standing to a particular plaintiff. This Court must still determine, on a case-by-case basis, that the issues are of sufficient weight, *see Jenkins v. Finlinson,* Utah, 607 P.2d 289 (1980), and that they are not more properly addressed by the other branches of government. Constitutional and practical considerations will necessarily affect our decisions in cases where a plaintiff who lacks standing under step one nevertheless raises important public issues. These are matters to be more fully developed in the context of future cases.

**6.** *See, e.g., Carpenter,* 667 P.2d at 1210; *Gilman,* 662 P.2d at 123; *Lewis,* 559 P.2d at 635.

**7.** *See, e.g., Coghill v. Boucher,* 511 P.2d 1297 (taxpayer's challenge of lieutenant governor's promulgation of regulations under elections statute).

**8.** *See Flast v. Cohen,* 392 U.S. 83, 100, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947, 962 (1968) ("federal courts will not entertain friendly suits ... or those which are feigned or collusive").

if the plaintiff appears to be incapable, for economic or other reasons, of competently advocating the position it has asserted.[9]

The instant case is undoubtedly one of public significance. If appellants prevail, the state must change its method of making state land available for mining. Some 50,000 existing mining claims may be affected. Under the current system, according to the appellants, the state is illegally giving up more than $100,000 annually in royalties. Further, the state is at risk of forfeiting to the United States extensive areas of state lands. The state has correctly acknowledged the significance of this case.

We turn now to consider whether appellants are appropriate parties to bring this suit. They are well represented by competent counsel who have forcefully presented their position. They are not sham plaintiffs; their sincerity in opposing the state's mineral disposition system is unquestioned. On the other hand, the state argues that there is a potential plaintiff with a more direct interest in the validity of the state's system. The state contends that the Attorney General of the United States may bring a forfeiture proceeding under section 6(i) and that this possibility means that appellants lack standing.

In our view, the mere possibility that the Attorney General may sue does not mean that appellants are inappropriate plaintiffs. In *Carpenter*, a resident and voter of the House District in question would theoretically have been more interested in litigating the question whether the district was malapportioned than was the non-resident plaintiff in that case. However, no such person had filed suit. We noted that the issues had been fully presented at trial and on appeal by the plaintiff, and held that she had standing. 667 P.2d at 1210. Similarly, in *Coghill v. Boucher*, we suggested that candidates or political parties might be more interested than registered voters and poll watchers in challenging the vote-counting procedures at issue. However, they had not done so. We noted that if the plaintiffs were not afforded standing, "it may well be that any review of executive activity in this area would be completely foreclosed." 511 P.2d at 1034. Thus, the crucial inquiry is whether the more directly concerned potential plaintiff has sued or seems likely to sue in the foreseeable future. The Attorney General has not sued nor are there any indications that he plans to do so.

Moreover, the appellants' interest in this suit is different than the Attorney General's would be if suit were brought in the United States District Court pursuant to section 6(i). Appellants are interested in preserving to the state the economic value of these lands. The Attorney General, however, would be bringing an action for forfeiture of these lands, contrary to appellants' interest.

■ For these reasons we conclude that appellants have standing as taxpayer-citizens to maintain this action.

### B. *A Declaratory Judgment Action Interpreting the Provisions of Section 6(i) May be Maintained.*

■ There has been much litigation concerning the meaning and scope of various statehood act land grants and their restrictions.[10] There have been frequent questions of ownership of the granted lands as between private or governmental contest-

---

**9.** One reason for the adversity requirement is to insure that the issues are well presented. As the Utah Supreme Court said, "When standing is predicated on the assertion that the issues involve 'great public interest and societal impact,' we will retain our practical concern that the parties involved have the interest necessary to effectively assist the court in developing and reviewing all relevant legal and factual questions." *Jenkins*, 675 P.2d at 1150–51.

In the analogous context of class action suits, one important criterion of a party's ability to effectively represent the class is its capacity, for economic and other reasons, to competently advocate its position. *See* 3B J. Moore and J. Kennedy, *Moore's Federal Practice* § 23.07[1.–1], at 23–215 (1985) (under Fed.R.Civ.P. 23(a)(4), "it has become routine to inquire into the competence, experience and vigor of the representative's counsel").

**10.** *E.g., Boyce v. Pima County*, 24 Ariz. 259, 208 P. 419 (1922); *Jensen v. Dinehart*, 645 P.2d 32 (Utah 1982); *cf. State v. University of Alaska*, 624 P.2d 807 (Alaska 1981).

ants.[11] Much of this litigation has occurred in the state courts. The question presented in this case is whether Congress intended to preclude all litigation concerning the meaning of section 6(i) by enacting the proviso which reads:

> That any lands or minerals hereafter disposed of contrary to the provisions of this section shall be forfeited to the United States by appropriate proceedings instituted by the Attorney General for that purpose in the United States District Court for the District of Alaska.

In our view, this question must be answered in the negative. It is clear that Congress intended that only the U.S. Attorney General could bring forfeiture proceedings and that such proceedings could only be brought in the United States District Court for the District of Alaska. No inference can be drawn, however, from either the context or the history of the Statehood Act that forfeiture proceedings were meant to be the only means by which a judicial interpretation of the meaning of section 6(i) could be obtained.

■ The sole reference to the land grant forfeiture provision which we have found in the legislative history appears in the Senate Report accompanying a 1954 bill providing for the admission of Alaska into the Union, S. 50, 83d Cong., 2d Sess. (1954):

> The Attorney General is authorized to take appropriate proceedings for forfeiture of any of the lands granted to the State which are disposed of contrary to these restrictions. In making the above provision, the committee has followed the practice prevalent in a number of mining States—a practice that has stood the test of time and experience.

S.Rep. No. 1028, 83d Cong., 2d Sess. 32 (1954). This reference is to the forfeiture clause of the Act of January 25, 1927 (commonly called the School Lands Act of 1927, 44 Stat. 1026, codified at 43 U.S.C. § 870(b) (1982)), which extended to public land states grants of certain numbered school sections which were mineral in character.[12] This clause has not prevented judicial interpretation of the School Lands Act in non-forfeiture proceedings.[13] We hold that the identical language in section 6(i) has a similar, non-preclusive effect. It would be unusual in the extreme if a state court could not construe the meaning of its state's Statehood Act. In the absence of any indication that Congress intended to bar our state courts from interpreting section 6(i), we conclude that appellants' declaratory judgment action seeking an interpretation of section 6(i) may be maintained.

## III. THE STATE'S DISPOSITION OF MINERALS VIOLATES SECTION 6(i) OF THE STATEHOOD ACT

Having determined that appellants have standing to bring this declaratory action, we now turn to their arguments on the merits. Their arguments may be summa-

---

11. *E.g., Rodgers v. Berger,* 55 Ariz. 433, 103 P.2d 266 (1940) (appeal from suit by private mining claimant against state and other private claimants to quiet title in mining claim on land granted under statehood act; in trial court, state alleged it was owner because land was a school section; state did not appeal trial court's judgment for plaintiff); *Texas Pacific Coal & Oil Co. v. State,* 125 Mont. 258, 234 P.2d 452 (1951) (corporation's suit against state to quiet leasehold title to oil and gas deposits under certain school land acquired by state under state enabling act); *cf. Lassen v. Arizona,* 385 U.S. 458, 87 S.Ct. 584, 17 L.Ed.2d 515 (1967) (appeal from Arizona Supreme Court ruling in case between two state executive agencies to compel compensation to trust created under New Mexico-Arizona Enabling Act); *State v. Walker,* 61 N.M. 374, 301 P.2d 317 (1956) (suit between State Highway Commission and Commissioner of Public Lands concerning rights of way or easements over state trust lands granted under New Mexico Enabling Act); *Ross v. Trustees of University of Wyoming,* 30 Wyo. 433, 222 P. 3 (1924) (suit between governor and trustees concerning land granted and confirmed by act of admission for university purposes).

12. The proviso in the School Lands Act states:
That any lands or minerals hereafter disposed of contrary to the provisions of this section shall be forfeited to the United States by appropriate proceedings instituted by the Attorney General for that purpose in the United States district court for the district in which the property or some part thereof is located. 43 U.S.C. § 870(b) (1982). This proviso is discussed in more detail in part IIIB of this opinion, *infra* p. 333.

13. *E.g., Rodgers,* 103 P.2d 266; *Jensen,* 645 P.2d 32.

rized as follows. Section 6(i) of the Statehood Act provides that the state must reserve to itself all of the minerals in the mineral lands granted to the state pursuant to section 6(a) and (b) of the Act. Furthermore, section 6(i) provides that "[m]ineral deposits in such lands shall be subject to lease by the State as the State legislature may direct." Appellants argue that because the state does not require the payment of rent or royalties from those miners whom the state permits to locate and extract hardrock minerals, the state violates section 6(i) of the Act. Appellants also argue that the state has violated section 6(i) by defining "mineral lands" subject to the lease requirement to mean those lands known to be of mineral character at the time of state selection, rather than all lands selected which are ultimately discovered to be of mineral character.

The appellants' arguments raise questions concerning the meaning of section 6(i), and of Congress's intent in granting the state mineral rights on the one hand, but restricting the state in its method of disposing of those minerals on the other. To answer these questions, we look to the plain language of section 6(i), to the legislative history of the Statehood Act, and to cases construing section 6(i). We also look to general principles of mining law to understand the framework within which section 6(i) must be analyzed.

### A. *General Principles of Mineral Disposition*

When Congress passed the Alaska Statehood Act, there were three methods for disposition of minerals located on federal lands: location, lease, and sale. Only locations and leases are relevant in the instant case.[14]

The location system is the oldest method of mineral disposition. It originated on the public domain as a matter of custom and was institutionalized by various statutes, the most important of which was the Mining Law of 1872.[15] Under the location system, the first claimant who discovers a valuable mineral deposit on unappropriated public domain, stakes and files a mining claim, and pursues it, has a legally protected interest. The locator is entitled to produce minerals from the deposit without paying rent or royalties, and has the right to obtain fee simple title by means of a patent issued by the United States government. 1 American Law of Mining § 30.01, at 30–3 (2d ed. 1985) (all references to American Law of Mining are to the 1985 edition unless otherwise noted).

Mineral leasing is the primary alternative to the location system. The Mineral Lands Leasing Act of 1920, 30 U.S.C. §§ 181–263 (1982), is the most important statute governing mineral leases; in many respects it has become the model for other federal mineral leasing acts. 1 American Law of Mining § 20.01, at 20–6–7. The Mineral Leasing Act was passed to supersede the location system as to the minerals it covers because of Congress's perception that important revenues were being lost under the older system.[16]

Under the Mineral Leasing Act, competitive leases are issued on lands known to contain valuable mineral deposits. 30 U.S.C. §§ 262, 272, 283. Bidders buy competitive leases from the government for a premium established at a public sale. 43 C.F.R. §§ 3521.2–2, 3521.2–4, 3521.2–5 (1985). Where valuable mineral deposits are not known to exist, a prospecting permit may be issued to the first qualified applicant. *See* 43 C.F.R. § 3510.0–3. If the permittee discovers a valuable mineral deposit, the permittee may be rewarded with a preference right lease. 43 C.F.R. § 3520.1–1. No premium is charged the lessee of a preference right lease for the privilege of leasing. However, both com-

---

**14.** The sale method pertains to certain varieties of sand and gravel and other common materials. 30 U.S.C. § 601 (1982).

**15.** Act of May 10, 1872, ch. 152, 17 Stat. 91. Portions of the Mining Act appear at 30 U.S.C. §§ 22–24, 26–30, 33–35, 37, 39–42, 47 (1982).

**16.** "[R]oyalties and rentals" were required "so that the Government may not be passing to title the natural resources without receiving something in return therefor." H.R.Rep. No. 1059, 65th Cong.3d Sess., at 20. (1919).

petitive and preference right lessees must pay an annual rental fee [17] and a production royalty, which is a specified percentage of the gross value of the leased substance produced. 30 U.S.C. §§ 262, 283.

Appellants contend that although section 6(i) requires the state to *lease* mineral lands, and presumably to obtain rents or royalties, the state does not in fact receive any revenues when it grants miners the right to produce hardrock minerals from state lands. Thus, appellants argue that the state's mineral disposition method is for all practical purposes a *location* system, except that miners may not receive patent to the mineral estate.

The state responds that section 6(i) does not require a revenue-producing rent or royalty; rather, that choice is left to the state legislature's discretion. The state also asserts that it receives as consideration the continued exploration and development of its lands and the benefits that come from an active mining industry.

We shall next consider the language of section 6(i) and its legislative history to glean Congress's intent in its grant and restriction of mineral lands.

### B. *Origin of Section 6(i)*

As we have already explained in part IIB of this opinion, the restrictive language in section 6(i) was derived from the 1927 School Lands Act.[18] In *Lewis*, we discussed the School Lands Act in another context:

In 1955, the Territory of Alaska, through its legislature, provided for a constitutional convention. Elected delegates adopted a Constitution on February 5, 1956, which was ratified by the people of Alaska on April 24, 1956. This Constitution adopted by the people of Alaska served as the basis for subsequent petitions to Congress for statehood and constituted an offer to accept the privileges and responsibilities of that status in accordance with its terms.

Throughout the process of drafting the Constitution and its adoption, there was considerable public controversy surrounding the issue of federal control over Alaska's power to dispose of its mineral resources. In statehood legislation for other states, Congress had limited land grants to non-mineral lands. Public lands, which were known to be chiefly valuable for commercial mineral production at the time of the grants, were retained in federal ownership for management and disposition under a theoretically unified system of federal mineral law. In part to avoid the litigation over titles which had resulted from this policy, Congress passed the School Lands Act of 1927, 43 U.S.C. § 870. This act extended the original statehood land grants to embrace lands mineral in character. These additional grants, however, were made subject to a mineral alienation condition which prohibited state disposal of land without a reservation of minerals and permitted a forfeiture action instituted by the Attorney General on behalf of the United States in the event of such disposal [43 U.S.C. § 870(b)].

---

**17.** The fees usually vary from 25¢ to $1.00 per acre, depending on the mineral. 1 American Law of Mining § 20.09[5]; *see also* 30 U.S.C. §§ 262, 283.

**18.** Act of January 25, 1927 (An Act Confirming in States and Territories Title to Lands in Aid of Common or Public Schools), ch. 57, 44 Stat. 1026, 43 U.S.C. §§ 870–71 (1982).
43 U.S.C. § 870(b) (1983) provides:
The additional grant made by this section is upon the express condition that all sales, grants, deeds, or patents for any of the mineral lands so granted shall be subject to and contain a reservation to the State of all the coal and other minerals in the lands so sold, granted, deeded, or patented, together with the right to prospect for, mine, and remove the same. Mineral rights in such lands shall be subject to lease by the State as the State legislature may direct, the proceeds and rents and royalties therefrom to be utilized for the support or in aid of the common or public school: *Provided,* That any lands or minerals hereafter disposed of contrary to the provisions of this section shall be forfeited to the United States by appropriate proceedings instituted by the Attorney General for that purpose in the United States district court for the district in which the property or some part thereof is located.

Although the constitutions of most states were written after passage by Congress of the relevant enabling acts, Alaska's Constitution was drafted in the absence of a pre-existing act. While the delegates were therefore unsure of the particular restrictive language which might be chosen by Congress, they were aware of the history of federal control over state disposition of mineral lands and the likelihood that the United States would insist on retaining its usual powers. To many of the delegates and the people of the state, these restrictions were unpopular.

559 P.2d at 636 (footnotes omitted). Thus, we see in the School Lands Act language echoed fifty-one years later in section 6(i) of the Alaska Statehood Act: a requirement that grantee states reserve the mineral interest when disposing of granted lands, and a provision allowing grantee states to dispose of minerals only by lease.

Implicit in this quotation from *Lewis* are several points which must be emphasized. First, prior to the enactment of the School Lands Act, the statehood land grants of many western states did not include certain "school lands" sections which were known to be mineral in character at the time for vesting.[19] *Andrus v. Utah*, 446 U.S. 500, 508, 100 S.Ct. 1803, 64 L.Ed.2d 458, 465 (1980); *see also* 3 American Law of Mining § 60.06[2], at 60–11–13. Second, if lands vested which were in fact of mineral character, *but whose mineral character was not known at the time of vesting*, the state owned the lands and minerals contained therein. *United States v. Wyoming*, 331 U.S. at 443, 67 S.Ct. at 1321, 91 L.Ed. at 1593. Third, in *United States v. Sweet*, 245 U.S. 563, 572–73, 38 S.Ct. 193,

195, 62 L.Ed. 473, 481 (1918), the Supreme Court held that congressional grants of school lands to a state conveyed no title to lands known to be of mineral character, even if the grant did not expressly reserve such mineral lands to the federal government. In other words, states received title to lands of known mineral character only when Congress expressly granted "mineral lands." Finally, the School Lands Act of 1927 served as an express congressional grant of school lands of known mineral character. Most importantly, the term "mineral lands" as used in the School Lands Act[20] is a term of art, and refers to the *time* that the mineral character of the lands was appreciated, not to the ultimately discovered nature of the lands.[21] *See also* Slaughter Memorandum *infra* p. 340.

## C. *Alaska Constitutional Response to Section 6(i)'s Restrictions*

The School Lands Act restrictions had already been incorporated into the Alaska statehood bills pending in the 84th Congress when the delegates for the Alaska Constitutional Convention met in the winter of 1955–56. The restrictions were controversial because they signalled a change from the existing location-patent system to a leasing system. Ultimately, however, the benefits of statehood were seen to outweigh the doubts of some of the delegates concerning the section 6(i) restrictions. The state constitution was adopted containing a provision expressly consenting to the section 6(i) restrictions.[22]

However, the framers also sought to preserve key elements of the existing location-patent system should Congress permit.

---

**19.** Title to surveyed sections vested at statehood; title to unsurveyed sections vested upon completion of an official survey. *United States v. Wyoming*, 331 U.S. 440, 443, 67 S.Ct. 1319, 1321, 91 L.Ed. 1590, 1593 (1947).

**20.** And as used in the Alaska Statehood Act § 6(i). *See* part IIIE of this opinion, *infra* p. 339.

**21.** The School Lands Act did not completely eliminate litigation of the question whether lands were of known mineral character at the

time of survey, however, because the state's interest in lands of known mineral character vested on the effective date of the School Lands Act, rather than at the time of survey. *See, e.g., Rogers*, 130 P.2d 268.

**22.** Alaska Const., art. XII, § 13 states:

All provisions of the act admitting Alaska to the Union which reserve rights or powers to the United States, as well as those prescribing the terms or conditions of the grants of lands or other property, are consented to fully by the State and its people.

Thus, they adopted Article VIII, § 11, which provides:

> Discovery and appropriation shall be the basis for establishing a right in those minerals reserved to the State which, upon the date of ratification of this constitution by the people of Alaska, were subject to location under the federal mining laws. Prior discovery, location, and filing, as prescribed by law, shall establish a prior right to these minerals and also a prior right to permits, leases, and transferable licenses for their extraction. Continuation of these rights shall depend upon the performance of annual labor, or the payment of fees, rents, or royalties, or upon other requirements as may be prescribed by law. Surface uses of land by a mineral claimant shall be limited to those necessary for the extraction or basic processing of the mineral deposits, or for both. Discovery and appropriation shall initiate a right, subject to further requirements of law, to patent of mineral lands if authorized by the State and not prohibited by Congress. The provisions of this section shall apply to all other minerals reserved to the State which by law are declared subject to appropriation.

According to one commentator (also a delegate to the Constitutional Convention):

> In part, this provision was inserted in the hope that Congress might recede from its restriction. On the other hand, delegates who concurred in the policy limiting permanent disposal of minerals went along with the proposal because they assumed Congress would stand firm. Most also saw the provision as a demonstration to miners, who might otherwise object to the constitution, that any restrictions applicable to alienation of mineral lands were being imposed from outside and were not the convention's doing.

V. Fischer, *Alaska's Constitutional Convention* 134 (1975).

Congress did not recede from the section 6(i) restrictions. The people of Alaska ratified the constitution in 1956. The Statehood Act was passed by Congress and signed into law on July 7, 1958. Section 8(b) of the Act required the voters to vote in favor of three propositions, one of which was that:

> (3) All provisions of the Act of Congress approved [July 7, 1958] reserving rights or powers to the United States, as well as those prescribing the terms or conditions of the grants of lands or other property therein made to the State of Alaska, are consented to fully by said State and its people.

Alaska Statehood Act § 8(b)(3). The voters accepted each proposition at the election held on August 26, 1958, and Alaska subsequently became a state on January 3, 1959. *See generally Lewis*, 559 P.2d at 636–39.

Having examined the origin of section 6(i) and the unsuccessful efforts of Alaska's Constitutional Convention to avoid its restrictions, we now turn to the legislative history for an understanding of Congress's intent underlying section 6(i)'s grant of mineral lands and leasing restrictions.

D. *Congress Intended that Alaska Receive Rents and Royalties from Section 6(i) Mineral Leases to Ensure the New State's Economic Viability*

The primary purpose of the statehood land grants contained in section 6(a) and (b) of the Statehood Act was to ensure the economic and social well-being of the new state. *Udall v. Kalerak*, 396 F.2d 746, 749 (9th Cir.1968), *cert. denied*, 393 U.S. 1118, 89 S.Ct. 990, 22 L.Ed.2d 123 (1969); *United States v. Atlantic Richfield Co.*, 435 F.Supp. 1009, 1016, 1021 n. 47 (D. Alaska 1977), *aff'd*, 612 F.2d 1132 (9th Cir.), *cert. denied*, 449 U.S. 888, 101 S.Ct. 243, 66 L.Ed.2d 113 (1980). One of the principal objections to Alaska's admittance into the Union was the fear that the territory was economically immature and would be unable to support a state government. For example, opponents of statehood claimed that "Alaska is not capable of sustaining statehood unless it is heavily subsidized by the other 48 States of the Union." 104 Cong.Rec. 9498 (1958) (statement of Rep. Smith). Similarly, another opponent to statehood argued that "The prevailing doubt of Alaska's ability to support itself is

evidenced by the generous special considerations which are made for it in this statehood act." 104 Cong.Rec. 12,297 (1958) (statement of Senator Talmadge).

The congressmen who favored statehood conceded that it would impose an additional financial burden on the territory, but they maintained that the Statehood Act sufficiently provided for Alaska's financial well-being. The land grant of 103,350,000 acres was perceived by these congressmen as an endowment which would yield the income that Alaska needed to meet the costs of statehood. Representative Dawson said that:

> All grants include the mineral rights, but these rights must be retained by the State if the lands pass into private ownership. In other words, the mineral rights will always belong to the people of Alaska, and never to private individuals....
>
> These provisions are the foundation upon which Alaska can and will build to the enormous benefit of the national economy shared by her sister States. We cannot make Alaska a "full and equal" State in name and then deny her the wherewithal to realize that status in fact.

104 Cong.Rec. 9361 (1958). The importance of mineral revenue to the new state is also highlighted by the following colloquy between Representative Miller and Alaska Territorial Senator William Egan:

> Miller: Do you see where you would get much income out of this 103 million acres you might select around, bearing in mind most of the forests and good land has been set aside by the Government now, or by the military? How much income would you derive from that to begin with?
>
> Egan: As to how much income would be derived, that would be entirely problematical, depending on the values that would be found there.... There are known deposits of almost every type of mineral.
>
>    ....
>
>    ... I feel there would be development....

*Statehood for Alaska: Hearings Before the Subcomm. on Territorial and Insular Affairs of the House Comm. on Interior and Insular Affairs*, 85th Cong., 1st Sess. 201–02 (1957) (remarks of Rep. Miller and William Egan, Alaska Territorial Senator and President of the Alaska Constitutional Convention).[23]

**23.** *See also* 104 Cong.Rec. 9360–61 (1958) (further remarks of Rep. Dawson; remarks of Rep. O'Brien); 104 Cong.Rec. 12,012 (1958) (remarks of Sen. Jackson).

The 103,350,000 acre grant ultimately provided in section 6(a) and (b) of the Statehood Act was one of unprecedented size whether considered either absolutely or as a percentage of the total land area of the state. H.R.Rep. No. 624, 85th Cong., 1st Sess. (1957), *reprinted in* vol. 1 Alaska Statutes "History of Alaska Statehood," at 20. As the colloquy between Representative Miller and William Egan suggests, another rationale for the unprecedented size was that the federal government had already reserved the most valuable land and the new state would, in effect, have second choice. In the House, Representative Saylor said that "the choice areas, more than 95 million acres, have been reserved for Federal agencies." 104 Cong. Rec. 9340 (1958). In Senate discussion of the federal reservations, Senator Robertson read a portion of the House report on the Act: "[T]his tremendous acreage of [federal] withdrawals might well embrace a preponderance of the more valuable resources needed by the new State to develop flourishing industries with which to support itself and its people." 104

Cong.Rec. 12,019 (1958). Thus, the large grant of 103 million acres was deemed necessary because the lands available for state selection were perceived to be only marginally productive.

Furthermore, Congress recognized that the agricultural potential of the statehood grant land was limited. In debate, Senator Byrd commented: "In all of the more than 365 million acres of land in Alaska, only 2 million or about one-half of 1 percent, are arable." 104 Cong. Rec. 12,336 (1958). Because Congress realized that agricultural development would not yield the revenue that Alaska would need to support statehood, the Act contained the provision granting the new state title to the mineral estate underlying the land grants. Senator Kuchel said in debate:

> I believe, however, on the basis of the values of property in Alaska as they have been estimated, the tremendous wealth in the ground in minerals ..., the State of Alaska will be able to make maximum use of the property which it will obtain under the bill from the Federal Government. This provision constitutes one additional assurance. I feel sure that economically the new government will succeed.

That Congress recognized the financial burden awaiting the new state is clear from its debates. It is equally clear that the large statehood land grant and the grant of the underlying mineral estate were seen as important means by which the new state could meet that burden. Congress, then, granted Alaska the mineral estate with the intention that the revenue generated therefrom would help fund the new state's government.

104 Cong.Rec. 12,035 (1958).

**24.** Appellants and the state agree that the third sentence of section 6(i) requires that mineral deposits be disposed of only by lease. Intervenor Alaska Miners Association argues that the "shall be subject to lease" language is merely permissive: "[A]ll that this sentence requires is that 'leasing' be one of the mechanisms through which these lands would be made available for mining development. It does not require that leasing be the *only* disposal mechanism." (Emphasis in original.)

The Miners' position on this point is contradicted by the structure of section 6(i). If the third sentence was not meant to express the exclusive method of mineral disposition, it need not have been set forth at all. Further, the legislative history demonstrates a uniform belief that section 6(i) required leasing. For example, the Senate Committee Report concerning language that eventually became section 6(i) states:

> Subsection (k) [of S. 50, 83d Cong., 2d Sess. (1954) ] provides that all grants made or confirmed under the act shall include mineral deposits. Thus, the fact that the lands desired by the State are known or believed to be valuable for minerals will not preclude the State from exercising its right of selection with respect to them under the several grants. *However, in order to give an added measure of protection to the new State government, which inevitably will be inexperienced and untried, the committee amendment provides for certain restrictions* upon the disposition by the State of mineral lands which it may select under the 100–million acre grant provided in subsection (b) or the 2,550,000–acre grant made in subsection (c). The restrictions are that the State must retain title to all the minerals in these lands, whenever any of them are sold or granted. *The State may dispose of the minerals in these lands only by lease* in such manner as the State legislature may direct.

S.Rep. No. 1028, 83d Cong., 2d Sess. 32 (1954) (emphasis added).

The Miners' argument that Congress intended the "shall be subject to lease" provision to be permissive is belied by the Miners' testimony objecting to this provision before the House Subcommittee on Territorial and Insular Affairs on March 15, 1957:

> Following is the statement of the Alaska Miners Association relative to *mandatory leas-*

The leasing restriction[24] in section 6(i) was intended to further the goal of state revenue production. As we have discussed, the restriction was taken from the 1927 School Lands Act. That language was copied advisedly so that Alaska would be on an equal but not a favored footing with other public land states with respect to the disposition of mineral lands.[25] The School Lands Act leasing requirement was expressly intended to be productive of pro-

> *ing of mineral rights* on all lands reserved to the new State of Alaska.
>
> ....
>
> We ... believe that the grant of mineral rights on all these lands was done to aid the new State in meeting the added expense of statehood....
>
> We believe that the well-intended actions contained in the enabling legislation will have an adverse effect and the *mandatory leasing of mineral rights* by the new State of Alaska under the conditions imposed would irreparably damage the development of Alaska's mineral resources....
>
> We believe that the Legislature of the State of Alaska should be allowed to determine the disposition of the mineral rights on all State lands except those specifically reserved for schools....
>
> All lands so claimed [by the state] shall have the mineral deposits reserved to the State and *it shall be mandatory that the State lease the mineral rights;* forfeiture of rights could result if disposed of contrary to provisions in the bills.

*Statehood for Alaska: Hearings on H.R. 50, H.R. 628, and H.R. 849 Before the Subcommittee on Territorial and Insular Affairs*, 85th Cong., 1st Sess. 217–18 (1957) (statement of Glen D. Franklin, Chairman, Legislative Committee, Alaska Miners Association) (emphasis added) (hereafter *"Hearings on H.R. 50"*). Thus, it is clear that the Miners Association recognized in 1957 that section 6(i)'s provision requiring that mineral lands be subject to leasing was a mandatory provision. Their argument to the contrary today is without merit.

**25.** In other words, the thought was that Alaska should be allowed to obtain mineral lands only if it would administer them in substantially the same manner that States now having mineral land grants are required to administer the lands obtained by them under those grants. This is evident from the close parallelism between the conditions proposed to be imposed upon Alaska and those contained in the 1927 [School Lands] act.

Memorandum from Herbert J. Slaughter, Chief, Branch of Reference, Division of Legislation, Department of the Interior, to the Honorable E.L. Bartlett, at 7–8 (Nov. 7, 1955) (regarding the mineral lands provision of the Alaska Statehood bills) (hereafter "Slaughter Memorandum").

ceeds, rents, and royalties, and congressional history indicates that the same result was intended in Alaska.[26] Further, in congressional hearings, the section 6(i) leasing requirement was equated with the "leasing procedures as provided under the Leasing Act of 1920."[27] As previously noted, the federal Mineral Leasing Act was passed rejecting the location system for certain minerals in order to provide revenue to the United States.

Moreover, although the mineral leasing systems of other states differ from the federal mineral lands leasing system, they are uniform in requiring the payment of rent, or royalties, or both. 3 American Law of Mining § 63.054(d), at 63–28.

State statutes may be divided into two principal categories describing the manner of payment of consideration for a lease; first, those that require both rents and royalties but credit the former against the latter or cease rental when the payment of royalties begins; second, those that require both rents and royalties as distinct and independent considerations.

*Id.* at 63–29 (footnotes omitted). We therefore conclude that the leasing requirement in section 6(i), considered in the context of the School Lands Act, the Mineral Leasing Act, other statehood mineral grants,[28] and mineral leasing systems in other states, mandates a system under which the state must receive rent or royalties for its mining leases.[29]

**26.** S.Rep. No. 1028, *supra* n. 24 (noting the "similar provision for the protection of the mineral school lands," in the School Lands Act); Slaughter Memorandum, *supra* n. 25. In *State v. Lewis,* we explained that

> The lands to be selected by the state included mineral lands so as to be consistent with the rights granted other states as a result of the School Lands Act of 1927.... The restrictions placed by Congress on alienation of Alaska's lands were of the same import as those set forth in that Act and applicable to other states.

559 P.2d at 638.

**27.** Hearings on H.R. 50, *supra* n. 24, at 220 (Rep. Aspinall); *see also id.* at 231 (Rep. Abbott).

**28.** *See, e.g.,* Oklahoma Statehood Act, Act of June 16, 1906, 34 Stat. 267, 273 (expressly including mineral lands, but prohibiting state from disposing of such mineral lands except by short-term lease). Statehood mineral grants are to be considered in light of the mining policies in existence at the time the grants are enacted. *Utah v. Bradley Estates,* 223 F.2d 129, 130 (10th Cir.1955).

**29.** The state argues that the language in the third sentence of section 6(i), "as the state legislature may direct," gives the state the discretion not to charge rent or royalties. It cites as authority for this proposition language from the Slaughter Memorandum. The memorandum first discusses earlier Alaska statehood proposals allowing the state to sell lands it selected, including mineral rights, with a reservation of a royalty on all minerals produced therefrom.

Concerning these proposals, the memorandum states:

> These earlier proposals, it will be noted, differ in a number of respects from the restrictions contained in the bills now pending. In particular, the current language expressly calls upon Alaska to adopt a mineral leasing system, while the earlier versions permitted the mineral deposits to be disposed of along with the surface, provided a royalty interest was reserved by the State. On the other hand, the current language does not attempt to prescribe maximum or minimum rates of royalty as did the earlier versions, but appears to leave the terms of leasing wholly to the discretion of the State legislature. From a practical standpoint, this second difference may be more important than the first, since if the Alaska legislature is left, as H.R. 2535 and S. 49 now intend to provide, with the untrammelled [sic] right to frame its own mineral leasing laws, it can, if it so ch[o]oses, establish priorities that will tend to keep the surface and mineral rights in the same hands and can, in general, fit the provisions of its mineral leasing system to whatever may be its concepts of the public interest.

Slaughter Memorandum, *supra* n. 25, at 9–10. We are unable to read this language in Slaughter's memorandum as broadly as the state suggests. The memorandum does not suggest that the state was free from the duty to charge rent or royalties. In fact, Slaughter states that "Alaska should not be accorded greater freedom in the administration of mineral lands than that accorded existing States having Congressional land grants." *Id.* at 2. As noted previously, other states under the School Lands Act were required to lease mineral lands in order to generate rents and royalties.

■ Although Alaska law requires mining leases for extracting hardrock minerals on those mineral lands thought to be subject to section 6(i),[30] the statutes do not require the payment of rent or royalties. AS 38.05.205, .210. Alaska Statute 38.05.-205(b) speaks of an annual rental of not less than the annual labor requirement which would be imposed if the lease were a location. However, no rent actually needs to be paid, because the lessee may credit the value of annual labor performed against the rental. Annual labor is required to ensure that the claim is worked so that the miner does not locate numerous claims and obtain the right to exclude others. 2 American Law of Mining § 7.2, at 102 (1st ed. 1983); *Chambers v. Harrington,* 111 U.S. 350, 353, 4 S.Ct. 428, 430, 28 L.Ed. 452, 453 (1884) ("Clearly, the purpose was ... to require every person who asserted an exclusive right to his discovery or claim to expend something of labor or value on it as evidence of his good faith and to show that he was not acting on the principle of the dog in the manger."). It is not a source of revenue to the landowner. Alaska's mineral leases are in substance indistinguishable from state mining locations.[31] Because they do not require rents or royalties, the state hardrock mineral leasing laws do not meet the leasing requirement of section 6(i).

E. *The Section 6(i) Leasing Requirement Applies Only to Statehood Grant Lands Whose Mineral Character was Known at the Time of State Selection.*

The appellants argue that the section 6(i) leasing requirement applies to all lands granted under section 6(a) and (b) which contain minerals. Their argument may be summarized as follows. Under the first sentence of section 6(i), all mineral deposits in selected lands are conveyed regardless of when the deposit's existence is first known. The term "mineral lands" in the second sentence of section 6(i), to which "such lands" in the third sentence of section 6(i) relates, refers to the same subject as the "mineral deposits" grant of the first sentence. Thus, all lands containing minerals are subject to the leasing requirement, regardless of when the minerals are discovered.

■ We agree with appellants that the grant language of the first sentence of section 6(i) contains the key to understanding the scope of the leasing requirement. We do not agree, however, that the grant language was intended to convey mineral deposits in selected lands whose mineral character was unknown at the time of selection. Unknown deposits would be conveyed automatically as a part of the section 6(a) and (b) grants without the use of the section 6(i) grant language. The section 6(i) grant was necessary so that *known* mineral deposits would be conveyed. *See* notes 19–21 and accompanying text, *supra.*

This interpretation is confirmed by the Senate Report on an early statehood bill (S. 50, 83d Cong., 2d Sess., (1954)) which states:

By the terms of previous statehood bills, and of S. 50 as introduced, the State was to have been permitted, under the land-grant provisions of those bills, to select large acreages of land, but in all previous bills, the State would have been estopped from choosing ... those lands known or even believed to be mineral in character. These severe limitations in previous statehood bills on the State's right to select were not always apparent from the bare language of those measures. Yet they existed within the legal and judicial interpretations which have

---

**30.** "Hardrock" minerals are those which were subject to location under federal mining laws as of the beginning of statehood, January 3, 1959. A.S. 38.05.185.

**31.** A letter authored by John Sims, Director of State Office of Mineral Development, described the proposed state leasing system which is now reflected in AS 38.05.205 as a system "which allows a miner on State land virtually all the rights and privileges of the 1872 Federal Mining Law with the express exclusion of patent right." Letter from John Sims, Director, Alaska Office of Mineral Development, to Howard J. Grey, Executive Director, Alaska Miners Association (Feb. 23, 1981).

heretofore been given as to the meanings of certain words and phrases of these previous proposed statehood bills.

> If all the resources of value were withheld from the State's right of selection, such selection rights would be of little value to the new State. As a part of this new approach toward statehood, your committee has felt obligated to broaden the right of selection so as to give the State at least an opportunity to select lands containing real values, instead of millions of acres of barren tundra.
>
> To attain this result, the State is given the right to select lands known or believed to be mineral in character (subsection k of section 5)....[32]

S.Rep. No. 1028, *supra* n. 24, at 6. The Report explains that subsection 5(k), the precursor to section 6(i), "provides that all grants made or confirmed under the act shall include mineral deposits. Thus, the fact that the lands desired by the State are known or believed to be valuable for minerals will not preclude the State from exercising its right of selection with respect to them under the several grants." *Id.* at 32.

The need for and the meaning of the grant language is also confirmed in the Slaughter Memorandum:

> The bills in the 84th Congress for the admission of Alaska into the Union contain a provision which affirmatively declares that the land grants made or confirmed by those bills shall include mineral deposits, and which then proceeds to impose certain express restrictions upon the manner in which Alaska may administer any mineral lands so obtained by it....
>
> The reasoning which prompted the adoption of the provision in question by

the Senate Committee is understood to be (1) that mineral deposits must be expressly mentioned in order for mineral lands to be encompassed by a Congressional land grant to a State; and (2) that Alaska should not be accorded greater freedom in the administration of mineral lands than that accorded existing States having Congressional land grants....

> With respect to those situations where, as was true of the Utah grants and the California school section grant, the law making the grant neither affirmatively included nor affirmatively excluded mineral lands, the Supreme Court has held that the failure to mention mineral lands was tantamount to an express exclusion of them from the grant....
>
> The members of the Senate Committee on Interior and Insular Affairs who took an active part in the study of S. 50, 83d Congress, considered that, in the light of the holdings of the Supreme Court, statutory language expressly including mineral deposits within the contemplated land grants to Alaska would probably be necessary in order for these grants to encompass mineral lands.

Slaughter Memorandum, *supra* n. 25, at 1–6 (citation omitted). Thus, the grant of mineral deposits in the first sentence of section 6(i) and the term "mineral lands" as used in the second sentence of section 6(i) both relate to mineral deposits in lands of known mineral character.

Appellants cite as support for their interpretation testimony of a representative of the Alaska Miners' Association before the House Subcommittee on Territorial and Insular Affairs on March 15, 1957. The representative, Mr. Franklin, assumed that mandatory leasing applied to all lands selected under what is now section 6(a) and

---

**32.** The report of the Committee on Interior and Insular Affairs on H.R. 7999, which became the Statehood Act, in language reminiscent of the Senate Report makes the same point:

> If the resources of value are withheld from the State's right of selection, such selection rights would be of limited value to the new State. The committee members have, therefore, broadened the right of selection so as to give the State at least an opportunity to select lands containing real values instead of millions of acres of barren tundra.

> To attain this result, the State is given the right to select lands known or believed to be mineral in character (sec. 6(i)).

H.R.Rep. No. 624, 85th Cong., 2d Sess. (1957), *reprinted in* 1958 U.S.Code Cong. & Admin. News 2933, 2939. The Committee thus used the phrase "lands known or believed to be mineral in character" as synonymous with the "mineral deposits" language in the first sentence of section 6(i).

(b) of the Statehood Act. *See supra* n. 24. Several congressmen seemed to join in this assumption. However, the question whether all lands selected under section 6(a) and (b), or merely those lands known to be mineral in character at the time of selection, would be subject to mandatory leasing was not addressed.

Appellants also point out that S. 50, as amended by the Committee on Interior and Insular Affairs (83d Cong., 2d Sess. (1954)), and H.R. 2536 (83d Cong., 2d Sess. (1954)), which closely followed the language of S. 50, contained a final sentence which provided: "For the purposes of this subsection the mineral character of lands granted to the State of Alaska shall be determined at the time patent issues and the patent shall be conclusive evidence thereof." This language was stricken at the request of Delegate Bartlett who stated:

> That amendment is offered at the suggestion of the Governor of Alaska and the Land Commissioner of Alaska. They were somewhat apprehensive about the rapidity with which lands would move to the new State if the requirement remained in that the mineral character of all the land would have to be determined in advance. And the rights of the United States, the attorneys tell me, are adequately protected in the foregoing part of that subsection.

*Hawaii-Alaska Statehood: Hearings Before the Committee on Interior and Insular Affairs*, 84th Cong., 1st Sess. 332 (1955) (statement of Delegate Bartlett) (hereafter *"Interior Committee Hearings"*). The committee chairman asked Delegate Bartlett: "It is your view, Mr. Bartlett, that language is surplusage and is not necessary?" Delegate Bartlett answered: "I do not think it is surplusage, but I will agree with the Governor and the Commissioner of Lands of Alaska, that had best be deleted." *Id.* The appellants argue that by agreeing to the deletion of this language, Congress must either have intended to utilize the traditional test of mineral lands or to define mineral lands as those containing minerals no matter when the minerals are discovered. The argument continues that

since Congress was aware that considerable litigation had resulted under the enabling acts of other states as to whether lands were or were not mineral in character, Congress could not rationally have intended to employ the traditional test.

While we agree that administrative problems would be avoided if the section 6(i) limitations applied to all lands granted under section 6(a) and (b), we think it is reading too much into the deletion of the quoted language to conclude that Congress meant by the deletion to change the meaning of "mineral lands" as used in the second sentence of the section. The "determination at patent" language demonstrates that Congress intended the section 6(i) limitations to apply only to section 6(a) and (b) lands of known mineral character. If this were not so there would be no reason for the determination of mineral character at patent. There is no suggestion that Congress intended to change the meaning of "mineral lands" in the second sentence by deleting the final sentence. Both the Chairman and Delegate Bartlett referred to this amendment as "pro forma," a characterization which could not accurately be used if the amendment were intended to change the definition of mineral lands. *Interior Committee Hearings, supra* p. 341, at 331, 333.

Appellants' final point is that construing "mineral lands" to mean all lands where minerals are found would further the congressional policy of assuring that the State of Alaska not squander the resources which it was granted. While it is true that the broader definition of mineral lands advocated by appellants would extend the protection of the section 6(i) restrictions, that does not mean that those restrictions were meant to have the reach which appellants contend. The context and history of section 6(i) heretofore cited persuades us that its restrictions were intended to apply only to lands whose mineral character was known at the time of selection.[33]

### CONCLUSION

We conclude that appellants have standing to maintain this declaratory judgment

---

**33.** For convenience, we have referred to the

relevant event as the time of selection. Wheth-

action, that the state's mineral leasing system violates section 6(i) of the Statehood Act because it does not require the payment of rent or royalties on mining leases, and that section 6(i) applies only to those lands known to have been mineral in character at the time of state selection. Appellants' state constitutional and public trust theories depend on the meaning of the grant and restrictions of section 6(i). Since section 6(i) directly controls, we have no occasion to examine those theories further. For the above reasons, the judgment is REVERSED and this case is REMANDED with directions to enter a declaration in accordance with this opinion and for such other further proceedings as may be appropriate.[34]

er this is the time that the state files its selection application, or some later event such as the tentative or final approval of the selection, is not an issue in this case or on which we express an opinion. Further, we observe that there is room for debate concerning how much must be known about the mineral character of selected lands to qualify them as mineral lands. We also intimate no view on this question as it is not before us.

**34.** The intervenors raise several other points in defense of the judgment below. We have examined each of them and find that they lack merit.